132 So.2d 386

Earl THOMPSON

v.

STATE.

8 Div. 783.

Court of Appeals of Alabama.

Aug. 15, 1961.

354

MacDonald Gallion, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Thompson, convicted of transporting liquor in violation of the five gallon law, Code 1940, T. 29, § 187, was sentenced to the penitentiary for two years.

Thompson claims two errors: (1) The State got its evidence by an unlawful search; and (2) the solicitor commented on Thompson's failure to testify. Code 1940, T. 15, § 305.

Two deputy sheriffs driving east met Thompson driving west. On their turning back and following him, Thompson speeded up, took a side road, then dodged up a private drive and stopped his car behind the dwelling house.

When the deputies came up Thompson had his car's trunk open and was reaching

Calvin, Gilchrist & Murphree, Decatur, for appellant.

for a "jacket can" partly hidden by burlap bags. The sack's "perforation" gave enough view for the officers to make out two cans.

Deputy Garrison testified (in the absence of the jury):

"A. I hollered to him to 'Hold it'. He stopped right there and didn't move any further.

"Q. To 'hold it'? A. Yes, sir.

"Q. Did you ask him anything or either you or your partner, or was anything said at that time or on that occasion if he lived there? A. Yes, sir, and he said, 'No sir'. I said, 'Who does?' He said, 'I don't know who lives here.'

"Q. Did he say what he was doing there? A. He said he was trying to get away from us.

*     *     *     *     *     *

"A. I asked immediately, 'Where he got—'Where did you get this?' He said 'I found it while I was working.' And I believe he said he found it the day before and hid it and picked it up this day.

"Court: Did he call it whiskey before you opened the can to inspect it? A. Yes, sir, he called it whiskey."

Part of Mr. Garrison's cross- (and voir dire) examination went into whether Thompson had told him before the seizure that the cans held whiskey. Mr. Garrison, on redirect, with the jury present, testified:

"Q. Prior to the time you took the cans out you said to be sure it was whiskey, what had the defendant said to you, if anything, about it being whiskey? A. I asked him where he got the whiskey and he said he found it, I said a few minutes ago, and he hid it to bring it in that day, carry it home with him, and we asked him *  *  *.

"Q. Did you ask if he lived there? A. We asked if he lived there, and he said no, and asked who did live there, and he said he didn't know, and asked why he went up there and he said trying to get away from us officers.

"Q. Was that the defendant you were talking to, over by Mr. Gilchrist? A. Yes, sir.

"Q. Was that—what was his name? A. Earl Thompson.

"Q. Earl Thompson? A. Yes, sir.

"Q. Did you see the whiskey—did you take the two gallons—two jacket cans of whiskey? A. Yes, sir."

On cross he stated:

" *  *  * I was looking in the trunk when I was pulling up to him in my car. I could see the trunk. I was behind him and the lid was open.

"Q. And how close did you go to the trunk then? A. I got out and walked in two or three feet and asked 'Where did you get it'?

"Q. Did you touch it at that time? A. No, sir.

"Q. Did you know it was anything or not? A. No, until I asked him.

"Q. Did you say, 'Where did you get the whiskey', or 'Where did you get this'? You testified both ways. What exactly did you say? A. I said, 'Where did you get this whiskey?' He said, 'I found it.'

"Q. Did you ask him 'Was that whiskey' or 'Where did you get it'? A. I said, 'Where did you get this whiskey'?

"Q. How did you know it was whiskey? A. I didn't know at that time. I just asked, 'Where did you get this whiskey', and he stated he found it."

Mr. Paul Smith, the other deputy, on being asked what Thompson had said about living on the premises, testified:

"I asked him if he lived there. He said, 'No, he didn't know who lived there; he was trying to get away from us.'"

Each can had in it five gallons of whiskey. Morgan was then (and now is) a dry county.

Save for "under a minute," Garrison and Smith kept Thompson in sight from their first meeting until they found him reaching in the car trunk for a jacket can.

Wolf v. People of State of Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782, is now extinct—Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684—and presumably too the rule of Shields v. State, 104 Ala. 35, 16 So. 85, goes out. Banks v. State, 18 Ala.App. 376, 93 So. 293, 24 A.L.R. 1359; Trueman, The Right of Search and Seizure, 2 Ala.L.J. 233.

In Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 734, 4 L.Ed.2d 697, we find dictum (used, however, to illustrate the opinion's ratio decidendi) which tends to show a belief by the court that a prisoner moving to suppress evidence must show he was lawfully on the premises searched. Thus:

"* * * No just interest of the Government in the effective and rigorous enforcement of the criminal law will be hampered by recognizing that anyone legitimately on premises where a search occurs may challenge its legality by way of a motion to suppress, when its fruits are proposed to be used against him. This would of course not avail those who, by virtue of their wrongful presence, cannot invoke the privacy of the premises searched. * * *"

■ As to the seizure from the car, we consider Garrison and Smith needed no warrant because of the openness of the trunk, the visibility of the cans and above all the defendant's admission. We do not need to rely on the emergency probable cause rule of Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. See also Tranum v. Stringer, 216 Ala. 522, 523, 113 So. 541, 544, where the court, per Bouldin, J., said:

"We conclude that under the Constitution and laws of Alabama the sheriff and other law enforcement officers have the same authority to search automobiles without warrant as federal enforcement officers, all subject to the rule of probable cause, as above defined."

■ Of the first 27 pages of testimony, 24 are taken up with examination of the deputies in the absence of the jury. Such delays should be avoided (where, as here, the defendant knows of the seizure) by a pretrial hearing of a motion to suppress.

Otherwise, we can envisage a trial judge in such a case treating an objection (to evidence obtained by an unreasonable search) not made until trial as being not well taken because too late. We see nothing in either Green v. State, 38 Ala.App. 189, 79 So.2d 555, or Kelley v. State, 39 Ala.App. 572, 105 So.2d 687, standing in the way.

In Robertson v. State, 94 Fla. 770, 114 So. 534, 537, we find this comment:

"When the admissibility of evidence depends upon the legality of the search and seizure by which it was procured, and the latter question in turn depends upon the determination of a question of fact which is susceptible of controversy, the better and safer practice is to move in advance of trial to suppress or restore the evidence in question, so that it will not become necessary to interrupt the progress of the trial for the determination of a controverted collateral issue, although such a preliminary motion is not always indispensable. [Listing cases.] There is considerable apparent diversity of opinion among the courts upon the proper procedure in cases of this nature in order to properly protect the defendant's constitutional immunities. The cases may be substantially har-

monized, however, by noticing the fact that, where the preliminary motion was held unnecessary, the illegality of the search usually appeared from an admitted or uncontroverted state of fact, or from the face of the warrant or the affidavit upon which it was based, therefore raising only a question of law; while in those cases in which the preliminary motion was held necessary the question of the illegality of the search usually depended upon a controverted issue of fact. * * *"

See also Gouled v. United States, 255 U. S. 298, 41 S.Ct. 261, 65 L.Ed. 647; Segurola v. United States, 275 U.S. 106, 48 S.Ct. 77, 72 L.Ed. 186; and Annotation 50 A.L. R.2d 531, § 11, at page 583.

■ The second point is put that T. 15, § 305, is "violated by indirect or covert references to defendant's failure to testify * * * [if the words used] are clearly calculated to direct attention * * * to the fact." Citing § 305, as amended, and Broadway v. State, 36 Ala.App. 542, 60 So.2d 697, 698.

In Broadway the solicitor had argued to the jury:

"* * * 'Mr. Smith criticizes our witnesses in this case, but Mr. Smith has not given us any witnesses to criticize.'"

The opinion goes on:

"In the case at bar appellant's counsel did not interpose any objection to the statement during the progress of the trial. The question is raised by a motion for a new trial. When the court heard the motion counsel made proof that the statement was made in the indicated form. This was not contradicted nor questioned."

Motion for new trial to bare error without prior objection at the trial under the Act of 1949 purporting to amend § 305 was disapproved in 257 Ala. 414, 60 So.2d 701. That device was not used here.

In this record we find the solicitor saying, "I have heard no dispute," and "There is no evidence it is not whiskey." The trial judge sustained objection to each of the quoted statements and on the first instance directed the jury that "I have heard no dispute" was improper argument not to be heeded. On the second occasion, he told them to adhere to the evidence alone: "the assertions of counsel are not evidence."

Each ruling was correct. The lack of evidence is an inescapable circumstance, all the more noticeable when the defense chooses to rest solely on the hoped for frailty of the prosecution's case.

Certainly, if the jurors believed the deputies, they then had to believe the cans held whiskey. Stating this by the logical device of negative demonstration was a legitimate argument.

Our statute is directed against counsel's making the defendant's choosing not to testify "the subject of comment." T. 15, § 305.

Three classes of comment appear in the reports: (1) *direct* (and patently bad), e. g., "The defendant did not go on the stand to explain where he got the horse," Matthews v. State, 16 Ala.App. 514, 79 So. 507; (2) *indirect* (also bad), e. g., "The *defendant* did not deny," "Why didn't *he* tell about it," "Whether *he* will ever state it or not, I don't know," "*He* did not deny he was at the still," "You have not heard the testimony of the *defendant* yet," "*He* hasn't explained it," "There is not one iota of testimony that *he* has denied this testimony," "If I had been *him* I would have * * * said, 'I quit right now,'" "*He* don't say he didn't do it," "Sitting here holding his mouth," and "We asked him in court and *he* hasn't explained it";—see examples given in Everage v. State, 33 Ala.App. 291, 33 So.2d 23; Harris v. State, 33 Ala.App. 623, 36 So.2d 254; Welch v. State, 38 Ala.App. 239, 81 So.2d 897; Street v. State, 266 Ala. 289, 96 So.2d 686—and (3) what we term *diffused* comment, e. g.,

"The defense has not offered any evidence," "Nobody denies that's the signature of Cleve Littlefield," and "Has his possession * * * been explained to you sufficiently?" Welch v. State, 263 Ala. 57, 81 So.2d 901; Littlefield v. State, 36 Ala. App. 507, 63 So.2d 565; Coats v. State, 257 Ala. 406, 60 So.2d 261.

All examples in (2) single out the defendant, whereas in (3) his identity is submerged into a reference to the weakness of the defense as a whole. In Vinet v. State, 38 Ala.App. 299, 83 So.2d 357, 359, a case of unexplained possession of a stolen cow, we find:

> "It was available to the accused to have explained this * * * by his own testimony or by that of other witnesses. It was not required that he testify in the case in order to establish the proof. It follows, therefore, that neither of the statements of the solicitor was necessarily a comment of the defendant's failure to testify. The appellate courts of this State have held that arguments of this kind and character do not violate the statute prohibiting the solicitor from commenting on the failure of the defendant to testify in his own behalf. Coats v. State, 257 Ala. 406, 60 So.2d 261, and numerous cases there cited."

Davis v. State, 259 Ala. 212, 66 So.2d 714, 717 ("the defendant put no testimony on the stand") seems to rest on the presumption of cure attending the trial judge's admonition that the jury not consider "any argument made as to the failure * * * of the defendant to testify."

Again in Willingham v. State, 261 Ala. 454, 74 So.2d 241, 246, ("has all the evidence been put before you that could have been had?"), "The error, if any, was eradicated when the trial court sustained * * * objection * * * and * * * instructed the jury that the argument was excluded * * *." Johnson v. State, 40 Ala.App. 39, 111 So.2d 614 (remarks as to why the defendant did not take the stand),

objection sustained, jury admonished: no reversible error.

Thus, under Welch, Littlefield, and Coats, supra, the remark of the solicitor was seemingly unobjectionable. Under the Davis and Willingham rules, the trial judge eradicated all taint, if any there was.

We have carefully reviewed the entire record as required by Code 1940, T. 15, § 389, and consider the judgment below should be

Affirmed.