156 So.2d 368

**Robert SWAIN**

v.

**STATE of Alabama.**

**7 Div. 581.**

Supreme Court of Alabama

Sept. 5, 1963.

Rehearing Denied Sept. 26, 1963.

Richmond M. Flowers, Atty. Gen., and Leslie Hall, Asst. Atty. Gen., for the State.

Orzell Billingsley, Jr., and Peter A. Hall, Birmingham, for appellant.

GOODWYN, Justice.

Robert Swain, a Negro, was indicted in Talladega County for the rape of a seventeen year old white girl, found guilty, and sentenced to death. His appeal here is under the provisions of the automatic appeal statute. Act No. 249, appvd. June 24, 1943, Gen.Acts 1943, p. 217; Recompiled Code 1958, Tit. 15, § 382(1), et seq.

Appellant filed motions to quash the indictment and the trial venire on the ground that Negroes were habitually, intentionally, and systematically excluded from the jury rolls of Talladega County, in violation of the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. The motion to quash the indictment was overruled after the taking

of considerable evidence at an oral hearing before the trial court. The court made a finding that the allegations of the motion "are untrue and not supported by the evidence."

The parties stipulated "that all legal and competent evidence submitted either for the defendant or for the state in connection with the motion to quash the indictment" was to be submitted "in support of and opposed to the motion to quash the jury venire" and was "to be considered by the court as if taken in connection with a hearing on this motion." The motion to quash the trial venire was also overruled.

Appellant was represented at his arraignment by two attorneys of his own choice. At that time he entered pleas of "not guilty" and "not guilty by reason of insanity." The same counsel represented him throughout his trial and on his motion for a new trial, and also represent him on this appeal.

Being mindful of our duty under the automatic appeal statute, we have carefully considered all of the testimony, even though no lawful objection or exception was made thereto, and find none seriously prejudicial to the rights of appellant; nor can we find, upon consideration of all the testimony, that the verdict is so decidedly contrary to the great weight of the evidence as to be wrong and unjust. See: Act No. 249, § 10, supra; Recompiled Code 1958, Tit. 15, § 382(10), supra. The verdict is amply supported by the evidence.

The evidence as to what happened on the occasion of the alleged rape was substantially as follows:

During the daytime on February 7, 1962, the complaining witness was at the home of her mother and father on the Millerville-Goodwater Highway in Talladega County. She was alone except for her four months old sister for whom she was caring. She heard a knock on the front door, opened it, and found appellant there. Appellant asked if there was a man there and if he could use a phone. He told the witness he had had car trouble and wanted to use the telephone. The request was refused. Appellant then gave her a number to call. She made the call but found the telephone was not in service. The telephone rang, she closed the door, and answered the phone. At that time, she saw appellant still standing on the porch and went back to lock the door. She went back to the telephone and talked to her present husband, then laid the telephone down and went to tell appellant to leave, at which time she opened the door and appellant pushed his way into the house. She then ran to the back door where appellant grabbed her and started choking her and told her he would kill her if she did not shut up. She started screaming. Appellant turned her loose and went back into the living room and put the telephone back on the hook. He then came back and stood against the door. He told the witness he was an ex-convict, or an escaped convict, and all he wanted was something to eat. She agreed to fix him something to eat if he would leave, but when she started to do so, he followed her to the kitchen and asked her to go into a bedroom with him. She refused several times. Appellant became angry. In the meantime, she had picked up the baby. She told appellant to turn off the heater, then started to run back into the living room and got out on the porch and off the porch into the front yard. She was running and fell, but got up and started to run again, leaving the baby lying on the ground. Appellant caught her. She was dressed at that time in a housecoat, pajamas, panties and brassiere. Her hair was rolled up on rollers and fastened with bobby pins. Appellant started pulling her back toward the house, first by her arms and then by her hair. He dragged her several feet by the hair back to where the baby was lying on the ground and told her to pick up the baby. He jerked the witness to her feet by the hair of her head. He then picked the baby up by her arm and again started pulling the witness back toward the house by her hair. When they got to the porch she grabbed one of the posts and wrapped her arms around it, at which time she was screaming. The post became loose from

the bottom of the porch. She tried to grab another post but could not. She wrapped a leg around part of the door facing. He took his hands and pulled her by her legs into the house and dropped her on the floor. She picked up the baby and pulled herself up into a chair and again asked him to leave her alone and to leave the house. While they were in the yard, appellant struck her in the face with his hands. After she sat down in the chair he sat down on the arm of the chair, put his arm around her, and tried to make her kiss him. She resisted his advances, and he started hitting her again in the face and told her to take off her pajamas, which she refused, whereupon he ripped off the left leg of the pajamas. He then forced her into a bedroom, where he told her that he would shoot the baby between the eyes. He then put the witness on the bed, took off her panties, laid down on top of her, told her he would kill the baby, and proceeded to have sexual intercourse with her. When he finished, he pulled her into the kitchen and told her not to tell anybody what had happened. About that time she saw her younger brother returning from school and appellant left by the rear door of the house. Later in the evening, she saw appellant at the Talladega County jail and identified him as her assailant.

■ The grounds of the motion to quash the indictment may be summarized as follows:

That Negroes are systematically excluded from the grand juries of Talladega County solely because of their race; that no member of such race, or a mere token number, are included on the jury roll or have their names placed in the jury box; that, if so placed, they are not drawn for service on any grand jury; that no Negro served on the grand jury which indicted appellant, "nor has any Negro served on a Talladega County, Alabama, grand jury in modern times; or if any Negroes have served on any of said grand juries, such service has only constituted a mere token number of eligible Negro male citizens"; that there

exists in Talladega County a system, practice, or custom, in drawing or organizing grand juries, which is "designed to totally exclude Negroes from service on such grand juries or to discriminate against Negroes solely on account of their race or color"; that the 1960 Federal census shows that, at the time the grand jury returned the indictment against appellant, that male population of Talladega County, twenty-one years of age and over, consisted of 12,125 whites and 4,281 Negroes; that the great majority of the Negroes possess all of the prescribed qualifications for selection and service as grand jurors; that, at the time of the indictment and at the present time, less than 5% of said Negro males were and are on the jury roll of said County; that "the method of selection of the names of Negroes to be placed on the jury roll and in the jury box of Talladega County, Alabama, by the jury commission, is highly irregular and arbitrary and contrary to the method prescribed by the Constitution and laws of the State of Alabama and of the United States"; that "members of the Negro race are, solely because of their race or color, arbitrarily, intentionally and systematically excluded in the selection of persons for Grand Jury duty, in that the great majority of those qualified for service in Talladega County, Alabama, are not included on the jury roll, or if included on said roll, their names are left out of the jury box, or if put into the box and drawn, they are not listed for service, and because of the aforesaid practices, no Negroes, or only a mere token number have served on a Grand Jury in Talladega County, Alabama, since the days of Reconstruction, or certainly not in modern times"; and that the grand jury which returned the indictment against appellant "was organized according to and in keeping with the aforesaid practice."

The motion to quash the trial venire is based on substantially the same grounds as the motion to quash the indictment, with the following additional grounds:

"Members of the Negro race, otherwise qualified to serve have been systematically excluded from service on the aforesaid

jury, or discriminated against in the organization of said jury, in that no member of the Negro race has been drawn for service thereon; or that a mere token number have been drawn for service thereon; that there is no probability of them actually trying or participating in the trial of this, or any other case"; that "since the year of 1953, and before, and continuing to this date, there has been a uniform practice by the jury board of Talladega County, Alabama, of discriminating against prospective Negro jurors solely because of their race or color, either by leaving their names off the jury roll altogether or by including so few of their names in the jury box from which the venire is drawn, as to keep the number of Negroes actually summoned for jury duty at a token amount"; and that there exists a "system or practice in the drawing or organization of juries to serve in Talladega County, Alabama, deliberately designed to discriminate against members of the Negro race in order to prevent them from serving on juries by either excluding them from the venire altogether or by keeping the number included so small that they can be systematically and uniformly struck from the venire and prevented from serving in the trial of any case"; that the trial venire drawn in this case "was selected in keeping with this practice," thereby depriving appellant of "his rights as guaranteed by the Constitution and Laws of the State of Alabama, and the Fourteenth Amendment to the Constitution of the United States of America."

The only points relied on by appellant for reversal are the overruling of his motions to quash. However, there are two other questions presented by the record which we feel should be discussed. Code 1940, Tit. 15, § 389. These are whether evidence obtained by the state toxicologist from a physical examination of appellant was properly admitted in evidence, and whether a statement by the solicitor in his closing argument to the jury constituted a comment on appellant's failure to testify, contrary to Code 1940, Tit. 15, § 305.

Our conclusion is that reversible error is not made to appear, and that the judgment is due to be affirmed.

### Motions to quash

The substance of the evidence on the motions to quash is as follows:

On the panel from which the grand jury was chosen, there were four or five Negroes. Two of these served on the grand jury which indicted appellant. Both the solicitor and the circuit clerk testified to this, and there was no contradiction of it. The solicitor, circuit clerk, an inferior court judge, and five attorneys from the county were witnesses at the hearing. The solicitor testified that he had seen as many as three Negroes sitting on Talladega County grand juries several times; that he could remember only three or four grand juries since 1953 that had all white membership (there are normally four grand juries empaneled a year in Talladega County); that as many as 80% of the grand juries organized since 1953 have had Negroes serving on them; that in the summer of 1955, the panel from which the grand jury was selected was 23% Negro, there being thirteen Negroes on it; that the jury panels usually contain from 10% to 12% Negoes; and that the panels normally consist of fifty to sixty persons. The testimony of the others in this group was substantially the same; that the usual number of Negroes on a grand jury venire is between four and ten; that none has ever seen a Negro sitting on a petit jury for the trial of a case but that the venire normally contains Negroes, but they are struck by the lawyers. It was stipulated that the trial jury venire of one hundred in this case included eight members of the Negro race. Other testimony at the hearing revealed that many Negroes who are qualified for jury duty either have been excused or are exempt from such duty under the provisions of Code 1940, Tit. 30, § 3, which exempts more than twenty occupational groups from jury duty.

The members of the jury commission testified that there has been no discrimination

in placing names on the jury roll; that, in securing names to be placed on the roll, officers of plants employing both whites and Negroes have been contacted for the purpose of getting names of qualified jurors; that members of the commission have talked personally with various persons, including Negroes, for the purpose of obtaining names they would consider qualified to serve as jurors; that city directories, telephone books, church rolls, club rolls, and voting lists are used; also, that names are obtained from a Farmers' Co-operative, the Farm Bureau, and the Rural Electrification Association, all of which have Negro members.

There was further testimony that, in compiling the jury roll, no distinction is made between white persons and Negroes; that the names are typed on the list alphabetically, with the occupation and address following the name; that plain white cards of the same size, texture and quality are used for making up the cards to be placed in the jury box; and that it is often difficult or impossible to tell from an address whether the name is that of a white man or a Negro.

Called as witnesses for appellant were thirteen Negroes who had lived in Talladega for varying lengths of time ranging up to 72 years. Four of these testified that they had previously been summoned at least once for jury duty, although none had actually served on either a grand or petit jury. The name of one of them was on the jury roll. Three others were over the age of 65, thereby being exempt from jury duty, and another had been arrested twice, thus leaving his character open to question. None of the Negroes who testified was employed at the all-Negro Talladega College which is located in Talladega County.

It is apparent from the testimony that, although Negroes normally have been on trial venires, they have been struck in the process of selecting the trial jury.

The problem of racial discrimination in the selection of jurors is an old one and has been before the courts on numerous oc-casions over the years. Certain principles have been formulated by these decisions which have application to this case.

It is well-settled that a defendant in a criminal case is denied the equal protection of the law, as guaranteed by the Fourteenth Amendment to the United States Constitution, if he is indicted by a grand jury, or tried by a petit jury, from which members of his race have been excluded because of their race. Neal v. Delaware, 103 U.S. 370, 26 L.Ed. 567; Rogers v. Alabama, 192 U.S. 226, 24 S.Ct. 257, 48 L.Ed. 417; Norris v. Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991. Our cases are to the same effect. Norris v. State, 229 Ala. 226, 156 So. 556; Millhouse v. State, 232 Ala. 567, 168 So. 665; Vaughn v. State, 235 Ala. 80, 177 So. 553; Vernon v. State, 245 Ala. 633, 18 So.2d 388; Fikes v. State, 263 Ala. 89, 81 So.2d 303, rev. on other grounds, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246; Reeves v. State, 264 Ala. 476, 88 So.2d 561. "Excluded," in the context of the stated principle, means a systematic, purposeful non-inclusion based solely on race. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839. This is not to imply that every grand and petit jury must contain members of the accused's own race. The accused has no right to have his race represented on the jury. Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; Martin v. Texas, 200 U.S. 316, 26 S.Ct. 338, 50 L.Ed. 497. Fairness in selection has never been held to require a proportional representation of races on a jury. In fact, a proportional limitation or representation, as such, is forbidden. Cassell v. Texas, supra; Virginia v. Rives, 100 U.S. 313, 25 L.Ed. 667; United States ex rel. Goldsby v. Harpole (5th Cir.), 263 F.2d 71, cert. den. 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78. It follows that the inclusion of a mere "token" number of persons of a certain race will not satisfy the constitutional requirements. Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Smith v. Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84. A violation

of these requirements can be accomplished either by state laws which are discriminatory on their face, or by employing "ingenious or ingenuous" devices in the administration of non-discriminatory laws so as to result in the proscribed discrimination. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; Avery v. Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244; Smith v. Texas, supra.

■■ The burden of proving discrimination is on the defendant. It is not to be presumed. Akins v. Texas, supra; Norris v. Alabama, supra; Martin v. Texas, supra; Tarrance v. Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572. However, once a defendant establishes a prima facie case of discrimination, the burden is then upon the state to refute it. Reece v. Georgia, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77; Pierre v. Louisiana, 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757; Hill v. Texas, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559. A prima facie case may be established by showing an unexplained absence from grand or petit jury service for a long period of time (Patton v. Mississippi, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76; Hill v. Texas, supra), or by statements of the jury commissioners that they listed no Negroes on the jury rolls, or they knew of no eligible Negroes in an area composed of a large proportion of Negroes (Cassell v. Texas, supra; Hill v. Texas, supra), or where a "marking" system is used to differentiate Negro names from white names on jury rolls or on cards used in the jury box. Avery v. Georgia, supra. Each case must, of course, be determined from its own particular facts, with due regard for the principles set forth in the cases. Patton v. Mississippi, supra.

Keeping these principles in mind, and examining the evidence presented at the hearing on appellant's motions, it is difficult to see wherein there was discrimination as alleged in the motions. In what way the Talladega County jury commission has discriminated in filling the jury box is not made to appear. There is not the slightest suggestion of any trickery or subterfuge in making up or marking the cards, or in the wording following the names on the jury roll and cards, or in the physical appearance of the cards, or in the manner of drawing the cards from the jury box in selecting jurors.

The general statutory provisions governing jury commissions, the preparation of jury rolls, the filling and refilling of jury boxes, and the drawing of juries, are embraced in Code 1940, Tit. 30, §§ 1–100. In addition, the Talladega County jury commission is regulated by Act No. 475, appvd. Sept. 9, 1955, Acts 1955, Vol. II, p. 1081. Under the provisions of Act No. 475, the jury commission is required to keep a roll containing the names of all male citizens living in the county who possess the qualifications prescribed by law and who are not exempted by law from serving on juries. Although the evidence indicates that all of the qualified persons in the county are not on the jury roll, still no evidence was presented that only Negroes have been left off. The means employed by the jury commission for acquiring names for the rolls simply were not exhaustive enough to insure the inclusion of all qualified persons, be they white or Negro.

Appellant alleges that if any Negroes have served on juries, they have been a mere "token" in number and that this is likewise prohibited by the Constitution. The census figures for Talladega County are cited in support of this contention. Such figures show that Negro males comprise 26% of the male citizenry of the County over the age of 21. The evidence established that from 10% to 23% of the members of the grand jury panels in the past several years have been Negroes. No evidence was presented by appellant showing the qualifications of the Negro community of Talladega County to serve on juries. As stated in Fikes v. State, supra:

"* * * It is not appropriate to say that they (Negroes) are entitled to be represented in the same proportion as the whites are represented unless their qualifications are in the same propor-

tion.' That does not appear. 'The comparison without that is not an accurate guide for a determination of the question. * * *"

In Akins v. Texas, supra, the United States Supreme Court had this to say:

"* * * A purpose to discriminate must be present which may be proven by systematic exclusion of *eligible* jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination. * * *" [Emphasis supplied.]

In the case at bar, no evidence as to the educational level of the general Negro population was offered in support of appellant's position. As previously pointed out, inclusion of a "token" number of Negroes on the jury rolls does not satisfy the constitutional requirements. However, no case has come to our attention which prescribes a formula for determining when "tokenism" ends and "fair" representation begins. The nature of the problem is one of degree and as such, must be dealt with on a case-by-case basis. From the evidence in this case, we see no basis for holding that the jury commission discriminated against the Negro race or followed a policy of "token" inclusion of members of that race. Cf. Smith v. Texas, supra. Our view is that appellant has not established a prima facie case in support of his motion to quash the indictment. See: 16A C.J.S. Constitutional Law § 540, pp. 467–474.

██ As to the contention that Negroes are systematically excluded from trial juries, the evidence discloses that Negroes are commonly on trial venires but are always struck by attorneys in selecting the trial jury. It has long been held that, where allowed by statute, peremptory challenges may be used without any assigned or stated cause. Pointer v. United States, 151 U.S. 396, 14 S.Ct. 410, 38 L.Ed. 208. Both the federal and Alabama jurisdictions have statutes providing for peremptory challenges. Code 1940, Tit. 30, § 53; 28 U.S.C.

§ 1870; Rule 24(b), Federal Rules of Criminal Procedure, 18 U.S.C., pp. 3407, 3423. The fact that the prosecution peremptorily strikes every Negro from the jury panel in a case where the defendant is a Negro does not constitute a violation of the defendant's constitutional rights of due process and equal protection of the law. Hall v. United States, 83 U.S.App.D.C. 166, 168 F.2d 161, 4 A.L.R.2d 1193, cert. den. 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775, and reh. den. 335 U.S. 839, 69 S.Ct. 9, 93 L.Ed. 391; United States v. Daniels (E.D. Pa.), 191 F.Supp. 129; Watkins v. State, 199 Ga. 81, 33 S.E.2d 325; People v. Roxborough, 307 Mich. 575, 12 N.W.2d 466; State v. Logan, 344 Mo. 351, 126 S.W.2d 256, 122 A.L.R. 417. The following statement by the Michigan Supreme Court in the Roxborough case is particularly appropriate here:

"The reason counsel may have for exercising peremptory challenges is immaterial. This right has been granted by law, and it may be exercised in any manner deemed expedient, and such action does not violate any of the constitutional rights of an accused. If appellant's argument is carried to its logical conclusion, it would do away with the basic attribute of the peremptory challenge, because, if such argument is accepted in all cases involving defendants of the negro race, the prosecutor, upon challenging prospective jurors of that race, would either have to assign a cause for such challenge or take the risk of a new trial being granted on the ground that he discriminated because of color; as a result, no one could safely peremptorily challenge a juror where the defendant was of the same race as the juror. * * *"

In Hall v. United States, supra, it was held that the Fourteenth Amendment was wholly inapplicable to this type situation. In that case the government struck nineteen Negroes from the jury panel and the Negro defendants contended that their constitutional rights thereby had been violated. The court said:

" * * * The requirements of due process were met when there was no racial discrimination in the selection of the veniremen. The government as a litigant was entitled to exercise twenty peremptory challenges, which means that its counsel could exclude from the jury that number of persons without assigning, or indeed without having, any reason for doing so. The Constitution does not require that the appellants, being Negroes, should be tried by a jury composed of or including members of that race. They legitimately sought to obtain the fancied advantage of having Negroes on the jury by using their peremptory challenges only against white members of the panel."

See: 4 A.L.R.2d 1200, Anno., "Use of peremptory challenge to exclude from jury persons belonging to a race or class."

### State toxicologist's testimony

At the time the warrant was served on defendant, he was informed he had the right to call an attorney, and to make any statement he wished, or not to make any statement. He was further told that any statement or anything he said or did could be used in court against him. There is no indication that he requested or wanted to see an attorney or anyone else.

After defendant was charged, the sheriff called a state toxicologist, who examined defendant at the Talladega County jail that evening. On his voir dire examination, the toxicologist testified that he introduced himself to defendant and told him of his official capacity; that he asked defendant if he had been mistreated in any way, to which he received a negative reply; that he explained to defendant what he wanted him to do and what he proposed to do; that he told defendant it was not necessary for him to comply in any way; that he proposed to make an examination of him and would testify in court as to what he found, whether it be favorable to defendant or against him; that if his findings were in favor of defendant, he would testify that way, and if against him, he would testify that way; that he asked defendant if he understood what he was trying to tell him, if he understood the seriousness of the charge, and if he wished to go ahead with the examination, to which defendant answered that he did; that he asked defendant if he had a lawyer, to which he replied that he did not; that defendant did not object to the examination and, in fact, told the toxicologist that he wished to go ahead with it.

The toxicologist testified that he told defendant he wanted him to stand on a piece of paper and take his clothes off and that he planned to make photographs of him; that he wanted defendant to drop his clothes onto the paper as he took them off; that, after he got through disrobing, he wanted him to initial and identify each of the items of clothing; that he wanted to examine defendant's private organs for the purpose of making a smear to determine whether there was evidence of semen present; that the only objection made by defendant to this procedure was that he did not want any of the photographs of him in the nude made available for general distribution; that he was assured the pictures would be only for court purposes.

The toxicologist then took a clean newspaper and laid it on the floor and had defendant stand on it. He then asked defendant to drop his clothes on another piece of paper as he took them off. Defendant initialed each item of clothing at that time.

Defendant was told that the reason for taking the pictures was to determine whether he had been injured or abused in any way. The toxicologist specifically asked defendant if he had been mistreated, to which he replied he had not. The toxicologist further testified that his physical examination of defendant did not show any significant abrasions, marks, bruises, or swelling on defendant's person.

The toxicologist asked defendant to brush his pubic hair onto the paper and

later made a microscopic examination of the hairs which fell on the paper and concluded some were from the body of a Negro and some from the body of a white person.

At the trial, appellant objected to the admission in evidence of the results of the toxicologist's examination, contending that his constitutional rights had been violated in that he was compelled to give incriminating evidence against himself in violation of the United States and Alabama Constitutions.

■■■ Where action taken by an accused is voluntary, there is no compulsion and the defense of self-incrimination with respect thereto is not available. Myhand v. State, 259 Ala. 415, 420, 66 So.2d 544; United States v. Wheeler (3rd Cir.), 275 F.2d 94. The principle is thus stated in 22A C.J.S. Criminal Law § 651, p. 548:

> "Generally, the constitutional guaranty against self-incrimination does not preclude the admission of real evidence produced by a reasonable examination of the body of accused; and the admission in evidence of the findings of experts on a physical or mental examination of the accused does not ordinarily violate his privilege, at least where the examination is had without any compulsion."

From 14 Am.Jur., Criminal Law, § 160, 1963 Cum.Supp., p. 180, n. 755, is the following:

> " * * * It is well settled that the constitutional provision forbidding compulsory self-incrimination is not violated by a voluntary physical examination of a defendant in a criminal case and that testimony based on a voluntary examination is not excluded by such provision."

See the following annotations on this point: 164 A.L.R. 967, at p. 976; 25 A.L.R.2d 1407, at pp. 1413–1415.

The case of Myhand v. State, 259 Ala. 415, 420, 66 So.2d 544, 548, supra, is directly in point on the question of admissibility of the evidence derived from the toxicologist's examination of appellant. The defendant in that case was a Negro, charged with raping a white girl. After his arrest, he submitted to an examination similar to the one conducted in the case at bar. He was asked to remove his clothing, so that it might be used as evidence, and he consented to the toxicologist conducting a "smear" test similar to the one conducted in the case before us. It was held that, since the defendant had voluntarily submitted to these actions, there was no merit to defendant's claim of self-incrimination. As there said:

> "We cannot agree with the position taken by counsel for appellant for two reasons; first, the evidence as it bears on the taking of the 'smears' fully supports the finding that appellant was not forced or coerced to permit the smears to be made. It appears from his own testimony that he was perfectly willing to submit to the tests. The evidence supports a finding that appellant was not compelled or induced to submit to the tests by threats or promises and the mere fact that the tests were made in the presence of officers of the law does not, in our opinion, conclusively show that appellant did not voluntarily permit the tests to be made. See Potter v. State, 92 Ala. 37, 9 So. 402."

The evidence in this case leads to a similar conclusion. There is nothing in the record to indicate that appellant was coerced in any manner in removing his clothing or in submitting to the examination by the toxicologist. As noted above, appellant already had been informed of his right to call an attorney.

Appellant further contended that the presence of the sheriff at the time he was requested by the toxicologist to submit to the examination constituted duress, the result being that the consent to the examination was actually coerced, and, therefore, ineffective. This argument was advanced in McManus v. Commonwealth, 264 Ky. 240, 94 S.W.2d 609, but the court was not

receptive to the contention, saying: "The mere fact that officers were present is insufficient to raise the presumption of duress." To the same effect are Myhand v. State, 259 Ala. 415, 420–421, 66 So.2d 544, supra, and Phillips v. State, 248 Ala. 510, 519, 28 So.2d 542, and cases there cited.

Whether such evidence would have been admissible if appellant had been under duress, we do not decide. We are of the opinion the evidence establishes that appellant voluntarily submitted to the examination and that the evidence derived from such examination was admitted without error.

*Argument of solicitor*

During his summation to the jury, the solicitor made this statement: "Gentlemen, do you think we have proved those three elements? I submit to you that it is not denied, there is not a word come from this stand that denied the charge of rape. We have proved it to you, gentlemen, beyond a reasonable doubt that this prosecuting witness was raped. Now the only question that the defendant has raised here by his attorneys is the question of identity."

Appellant objected to this argument, and moved for a mistrial, on the ground that it "was with reference to the fact that the defense offered no testimony." The objection and motion were overruled and appellant excepted.

Code 1940, Tit. 15, § 305, as amended by Act No. 124, appvd. June 23, 1949, Acts 1949, p. 150, provides as follows:

"On the trial of all indictments, complaints, or other criminal proceedings, the person on trial shall, at his own request, but not otherwise, be a competent witness; and his failure to make such a request shall not create any presumption against him, nor be the subject of comment by counsel. If the solicitor or other prosecuting attorney makes any comment concerning the defendant's failure to testify, a new trial must be granted on motion filed within thirty days from entry of the judgment."

The statute does not prohibit a prosecutor from drawing reasonable inferences from the evidence presented in a case, and statements to the effect that the evidence is uncontradicted or undenied are not prohibited by the statute. See: Welch v. State, 263 Ala. 57, 58, 81 So.2d 901; Thompson v. State, 41 Ala.App. 353, 357–358, 132 So.2d 386; Dixon v. State, 39 Ala. App. 575, 105 So.2d 354; Littlefield v. State, 36 Ala.App. 507, 63 So.2d 565, cert. den. 258 Ala. 532, 63 So.2d 573; Dickey v. State, 21 Ala.App. 644, 111 So. 426. In Welch v. State, supra, the following was approved as a correct statement of the law:

"It is generally held that a statement by the prosecuting attorney to the effect that the evidence for the State is uncontradicted or undenied is not a comment on the defendant's failure to testify."

We hold that the solicitor's argument was not violative of § 305, Tit. 15, as amended, supra.

We have carefully reviewed the entire record, as required by Code 1940, Tit. 15, § 389, supra, and find no reversible error.

The judgment is due to be, and is, affirmed.

Affirmed.

LIVINGSTON, C. J., and SIMPSON, MERRILL, COLEMAN and HARWOOD, JJ., concur.