329 So.2d 126

**Robert HILL**

v.

**STATE.**

**4 Div. 347.**

Court of Criminal Appeals of Alabama.

Jan. 20, 1976.

Rehearing Denied Feb. 17, 1976.

Bryant F. Williams, Jr., Ozark, for appellant.

William J. Baxley,` Atty. Gen., and C. Lawson Little, Asst. Atty. Gen., for the State.

LEIGH M. CLARK, Supernumerary Circuit Judge.

By a petition for writ of error coram nobis, petitioner, now the appellant from a denial of the petition, sought to nullify his conviction of murder in the first degree which has been affirmed on appeal and reported as *Hill v. State*, 53 Ala.App. 23, 296 So.2d 921. The proceeding was instituted by petitioner pro se, but he has had the benefit of diligent appointed counsel, both on the hearing below and on appeal.

The gravamen is that he was denied due process of law and equal protection of the laws, guaranteed to him by the Fourteenth Amendment to the Constitution of the United States. In the original petition drafted by him, he complains that he was indicted by an all-white grand jury and tried by an all-white petit jury. The petition was broadened by his attorneys by amendment, wherein it was charged that "the jury roll at the time of petitioner's trial was arbitrarily composed such that it offered no adequate representation of a cross-section of the community," and that it contained "an insufficient percentage of Blacks, denying petitioner due process of law . . . by systematically excluding Blacks and by failing to be adequately representative of the community."

A lengthy hearing was conducted, in which several witnesses testified and voluminous documents were offered in evidence, including "the jury roll itself" at the time of the hearing on the petition.

The murder trial was in June 1972. The coram nobis petition was filed in September 1974. In its brief the State challenges, and in response to the petition in the court below it challenged, the right of petitioner to maintain a proceeding for post-conviction relief on the ground of discrimination in the process for obtaining the grand jury and petit jury that indicted and convicted defendant, urging that defendant's failure to bring the matter to the attention of the court before or during trial constituted a waiver of his ground of complaint. It was so held in *Morris v. Sullivan*, 497 F.2d 544 (5th Cir. 1974). In so holding the court followed the Alabama decisional law on the subject. *Ex parte*

*Seals,* 271 Ala. 622, 126 So.2d 474 (1961); *Hamilton v. State,* 283 Ala. 540, 219 So.2d 369; *Washington v. State,* 269 Ala. 146, 112 So.2d 179. The court also held that its decision was in accord with, and that an opposite decision would be contrary to, *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 and *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357.

There is a general allegation in the amended coram nobis petition, unsupported by any evidence, that the facts alleged in the petition "were not known to petitioner or to the Court at the time of trial." The petition gives no reason for the petitioner's not knowing such facts. Furthermore, the record indicates, if it does not conclusively show, that on the trial of the murder case, petitioner and his attorney knew as much about the composition of and the method of constituting the jury roll and the jury box, as they did at the time of the filing of the coram nobis petition.

Appellant's failure to protest, at the most appropriate time, against an alleged invasion of his constitutional right to a representative jury, that is, a jury or a jury roll in which his particular race would be constitutionally represented, was not a mere waiver of his right. With knowledge at the time of trial of the facts forming a basis for an objection to trial, it constitutes a specie of estoppel for one to forego an objection and proceed with the trial in the hope, often a lively hope, of a verdict in his favor. After such a venture that has failed, he should not be permitted to obtain another trial by the assertion of a claim he could have made before his trial.

Notwithstanding our conclusions hereinabove expressed, we will proceed to consider the other issues on this appeal.

A large part of the testimony was more in the nature of evidence taken in a discovery proceeding than in a hearing on the issues presented by the petition and answer of the State. No criticism is directed at anyone in this respect, but witnesses were called upon at times to give their opinion or judgment or estimate without any assurance that the same would be accurate. As a result, there are conflicts and confusion in the record as to the number, race, and percentage of specific races in the jury box and in the jury roll at particular times. However, there seems to be no basis for a dispute as to 1970 census figures showing that there were 29,559 persons 21 years of age or over in Dale County, that 25,839 were white and 3,276 were black, or approximately eighty-nine percent white and eleven percent black. The jury roll introduced in evidence by petitioner, and used largely as a basis for the charge of discrimination, contained 2,881 names at the time of the hearing on the coram nobis petition. Of these names, 334, between eleven and twelve percent, were black.

In the original pro se petition, filed soon after petitioner started serving his sentence, petitioner seemed to be basing it chiefly upon *Peters v. Kiff,* 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972), to which reference was repeatedly made in the petition. *Peters v. Kiff* stands preeminently for the proposition, not theretofore decided by the Supreme Court, that a white person has standing to assert a claim of unconstitutional discrimination against the Negro race in the preliminary process to obtain a jury for the trial of his case. Though he focused his attention upon that case, we find no further reference to it, and we do not understand that he claims that his case is like *Peters v. Kiff* in the particular respect noted, but whether so or not, it would make no difference according to the case, and we are bound by it.

The basic contentions of appellant are (1) that the jury roll at the time of the drawing of jurors for his trial in 1972 did not contain enough names of qualified jurors to assure a fair trial by an impartial jury and (2) that the composition of the grand jury that indicted petitioner and the petit jury venire from which the jury was selected that tried him was so weighted against the Negro race as to "establish a prima facie case of discrimination unre-

butted by the state." In addition, appellant urges that the trial court erred in sustaining the State's objections to certain questions asked by petitioner's counsel relative to a difference in the composition of the jury roll at the time of trial and at the time of the coram nobis hearing, more than two years after the trial.

There was no memorial of the number of jurors on the jury roll at the time of the trial, but from rather unsatisfactory and inconclusive statements by some of the witnesses, it seems that about 2,500 or 3,000 were on the jury roll at that time. The evidence is so unsatisfactory as to the particular point that we do not find that appellant in his brief attempts to state his view as to the number. We should note also that in contending that there were not enough jurors in the jury box to represent a cross section of the county, appellant in his brief refers at times to the jury roll at the time of the coram nobis hearing rather than to the jury roll at the time of the trial. He says that there is testimony "to the effect that in 1972 only 1,500 to 2,000 names were on the jury roll." What the particular witness said was that there were approximately 4,000 names on the jury roll at the time of his testimony and that 1,500 to 2,000 had been added since June 1972. This would make, it seems, 2,000 to 2,500 on the jury roll in 1972, if it is assumed that all of the names on the roll in June 1972 remained thereon until the coram nobis hearing, which certainly cannot be assumed.

■ Even though the record supports the contention that no more than about eight or ten percent of persons 21 years of age or over in Dale County were enrolled for jury service at the time of defendant's trial, there is no evidence in the record that such number did not represent a cross section of the county. Although a much larger percentage would have made the roll more like Caesar's wife should have been, the percentage is not so small as to furnish a presumption of purposeful discrimination so as to place the burden upon the State to disprove the charge.

In support of his apparent thesis that the number of persons on the jury roll at the time of defendant's indictment and trial was so small that it did not furnish a cross section of the county, appellant cites *State ex rel. Gregg v. Maples,* 286 Ala. 274, 239 So.2d 198 (1970); *Bokulich v. Jury Commission,* 298 F.Supp. 181 (N.D.Ala.1968); *Mitchell v. Johnson,* 250 F.Supp. 117 (M. D.Ala.1966); *White v. Crook,* 251 F.Supp. 401 (M.D.Ala.1966); *Turner v. Spencer,* 261 F.Supp. 542 (S.D.Ala.1966). None of the cases supports the proposition advanced. *State ex rel. Gregg v. Maples* stands preeminently for the principle that a list of voters could not be validly prescribed and used as the list from which the names of prospective jurors are to be obtained. In Bokulich, the court looked at both the procedure and the result the result being a much smaller (about one-half) percentage of Negroes than whites from the jury roll in Greene County, in which the percentage of Negro residents was about twice that of whites. In *Mitchell v. Johnson,* the system that produced the result of about one-half the number of Negroes as white on the jury roll in the county (Macon), composed of four times as many Negroes as whites, was declared unconstitutional. In *White v. Crook,* the result of the system employed was that in a county (Lowndes) wherein Negroes composed 80.7 percent of the total population of 15,417, the number on the jury roll was nominal. In *Turner v. Spencer,* the court said as to the counties of Hale, Wilcox, and Perry:

"The existence of a pattern and practice of exclusion of Negroes from jury service in the counties is virtually uncontroverted."

We search the record in vain for evidence that the jury roll extant at the time of defendant's indictment and conviction was not composed of a cross section of Dale County, whether we take cross section to mean "fair sample," as stated in *United*

*States v. Dennis,* 183 F.2d 201, 224 (2nd Cir. 1950) aff'd *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, or as more generally defined, "A composite representation typifying the constituents of a thing in their relations." *Webster's International Dictionary* (2nd Ed.).

■ After appellant had obtained, by order of court, a copy of the jury roll at the time of the coram nobis hearing and had discovered that there was no disparity between the percentage of Negroes thereon and the percentage of Negroes in Dale County, had introduced the list into the evidence on the coram nobis hearing and had questioned witnesses extensively about it, he asked on redirect examination of one of the jury commissioners he had called as a witness, ". . . how many blacks have been added since 1972?" Of another jury commissioner he had called as a witness, he asked "Now, Mr. Johnson, how many names have you submitted at the last chance that you had to submit names?" The court sustained the State's objection to each of the questions. Appellant assigns as error the action of the court in this respect. This indirect approach, this setting up the 1974 jury roll as a straw man, knocking it down and attempting therefrom to raise up a case of discrimination in the 1972 jury roll, would not have produced any definite favorable result to petitioner, we are convinced by the record. The procedure was not accompanied by any indication of such a result. Furthermore, the record conclusively shows that neither witness could have answered the question to which an objection was sustained. The first witness mentioned had been asked by petitioner's counsel, "Is there any way to tell whose name was added since 1972?" and his answer was, "No, because we don't put a date on it." He had previously been asked by petitioner's counsel "How—taking a guess at how many—well, state how many names have been added since June, 1972?" to which he answered, "I'd say a couple of thousand."

He had also testified on interrogation by petitioner's counsel that in 1972 about 15 percent of the total number on the roll were blacks. The other witness, who was responsible for a beat in the county that included Ozark and who went on the commission in 1971, was allowed, without objection, to answer questions on redirect examination by petitioner's counsel as to additions to the jury roll proposed by him during "the period 1971 until now." He said that he had added more blacks than whites. He was then asked, "How many have you done?" He replied, "Like I say, I had a record at home, but it's been misplaced and I wouldn't say how many."

No error injurious to petitioner is to be found in the court's sustaining objections to the questions under consideration. The guesswork called for by this particular post-conviction, post-affirmance of conviction, proceeding emphasizes the soundness of the principle that the asserted constitutional question should have been presented at or before the trial of defendant.

In support of his contention that a "substantial disparity in the representation of appellant's race on the grand and petit jury venires when compared to the racial make-up of the county population" establishes a prima facie case of discrimination unrebutted by the State, petitioner relies largely upon *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) and *Jones v. Georgia,* 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967). Both of the cited cases are grounded on some factors not found in the instant case, particularly "the disparity between the percentage of Negroes on the tax digest and those on the venires." *Whitus, supra,* 385 U.S. at 552, 87 S.Ct. at 647, 17 L.Ed.2d at 605 and *Jones, supra,* 389 U.S. at 25, 88 S.Ct. at 5–6, 19 L.Ed.2d at 27. Even without that factor, the disparity between the percentage on the venires and the percentage in the population in those cases is far removed from the disparity in this case. in *Whitus,* the percentage relative to

population was more than four times the percentage on the grand jury venire and more than five times the percentage on the petit jury venire; in *Jones,* the percentage as to population was more than six times the percentage on the petit jury venire and on the grand jury that indicted Jones.

The most that appellant can claim for himself as to disparity shown by the percentage of Negroes on the grand and petit jury venires is that there were fifty-five persons on such venire and three of them,[1] or 5.4 percent, were black; that twenty-eight persons were drawn from the grand jury and that only one, or 3.6 percent, was black.[1] It is also to be observed that of the twenty-eight persons drawn from the grand jury, only twenty-three appeared, the absence of the others being accounted for by various reasons such as hospitalization, death and "not found." When "compared to the racial make-up of the county population" in each of the three counties, the disparity is less than one-half the disparity found in either *Whitus* or *Jones,* supra.

We must follow *Swain v. Alabama,* 380 U.S. 202, 208, 85 S.Ct. 824, 829, 13 L. Ed.2d 759, 766, (1965) in which it was said:

"Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn. *Virginia v. Rives,* 100 U.S. 313, 322–323, 25 L.Ed. 667, 670–671; *Gibson v. Mississippi,* 162 U.S. 565, 16 S.Ct. 904, 40 L.Ed. 1075; *Thomas v. Texas,* 212 U.S. 278, 282, 29 S.Ct. 393, 394, 53 L.Ed. 512, 513; *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.

Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group. 'Obviously the number of races and nationalities appearing in the ancestry of our citizens would make it impossible to meet a requirement of proportional representation. Similarly, since there can be no exclusion of Negroes as a race and no discrimination because of color, proportional limitation is not permissible.' *Cassell v. Texas,* 339 U.S. 282, 286–287, 70 S.Ct. 629, 631, 94 L.Ed. 839, 847 (opinion of Mr. Justice Reed, announcing judgment). We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. See *Thomas v. Texas,* 212 U.S. 278, 283, 29 S.Ct. 393, 394, 53 L.Ed. 512, 514; *Akins v. Texas,* 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed. 1692; *Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L. Ed. 839. Here the commissioners denied that racial considerations entered into their selections of either their contacts in the community or the names of prospective jurors. There is no evidence that the commissioners applied different standards of qualifications to the Negro community than they did to the white community. Nor was there any meaningful attempt to demonstrate that the same proportion of Negroes qualified under the standards being administered by the commissioners. It is not clear from the record that the commissioners even knew how many Negroes were in their respective areas, or on the jury roll or on the venires drawn from the jury box. The overall percentage disparity has been small, and reflects no studied attempt to include or exclude a specified number of Negroes. Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was

1. There is some evidence of the presence of four blacks on the petit jury venire.

made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race. We do not think that the burden of proof was carried by petitioner in this case."

Assuming a desideratum of representation of Negroes on a petit jury venire of a percentage equal to their percentage of the total population that could conceivably be used for jury service, the percentage in the instant case more nearly reached that goal than did the percentage in *Swain*. It was approximately 100 percent greater than the percentage in *Swain*. Assuming a similar desideratum as to the grand jury, the percentage of Negroes in the instant case fell short of the percentage of *Swain* by about 25–35 percent, but if only one more Negro had been on the grand jury in this case the percentage of that race in relation to its percentage of total population would have exceeded the percentage in *Swain*. On the whole, as to the grand jury and petit jury considered together, the percentage of Negroes when compared to their percentage in population was greater in the instant case than in *Swain*, which met the approval of the Supreme Court.[2]

*Swain v. Alabama, supra,* has also put to rest any contention by appellant that peremptory challenges by the State, or striking without making known the cause, to the extent of "the striking of Negroes in a particular case is a denial of equal protection of the laws." 380 U.S. at 221, 85 S.Ct. at 836, 13 L.Ed.2d at 773.

The judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Supernumerary Circuit Judge LEIGH M. CLARK, serving as a judge of this Court

under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby

AFFIRMED.

TYSON, HARRIS, DeCARLO and BOOKOUT, JJ., concur.

CATES, P. J., concurs in the result.

---

2. In *Swain*, there were 8 blacks on a petit jury venire of 100. *Swain v. State*, 275 Ala. 508 at 513, 156 So.2d 368 at 373. Four or five Negroes were on the grand jury venire of about 33.