278 So.2d 183

**Hugh Gray WHISTENANT**

**v.**

**STATE.**

**7 Div. 166.**

Court of Criminal Appeals of Alabama.

Feb. 20, 1973.

Rehearing Denied March 20, 1973.

Donald W. Stewart, Anniston, for appellant.

William J. Baxley, Atty. Gen., and David Lee Weathers, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted by a jury in the Circuit Court of Cleburne County for the offense of buying, receiving, concealing, or aid in concealing stolen property.

The indictment is as follows:

"INDICTMENT

"THE STATE OF ALABAMA — CIRCUIT COURT OF CLEBURNE COUNTY

"CLEBURNE COUNTY — FALL TERM, DECEMBER 2nd, 1971

"The Grand Jury of said County charge that, before the finding of this Indictment, Hugh Gray Whistenant, whose true name is to the Grand Jury otherwise unknown, did Buy, Receive, Conceal, or Aid in Concealing, One (1) 1970 Pontiac Catalina automobile, I/D 252370P101096. A better description of which being unknown to the Grand Jury, of the value, of to-wit: $3,000.00, the personal property of Otis C. Duvall knowing that the same had been stolen, or having reasonable grounds for believing same had been stolen, and not having the intent to restore it to the owner, . . . . against the peace and dignity of the State of Alabama.

"/s/ Otis MacMahon

District Attorney, Seventh Judicial Circuit"

Appellant demurred to the indictment and the same was overruled by the trial court.

The facts necessary to an understanding of this case appear below.

Otis C. Duvall, Jr., testified that on October 19, 1971, he was living at a motel in Birmingham, Alabama, where he was employed at Eskew & Son in Homewood. His permanent residence was in Phenix City, Alabama. On this date he was the owner of a 1970 Pontiac Catalina 400, dark green body with black vinyl top. It was a two-door hardtop. It was a used car and was purchased from an automobile dealer

in Columbus, Georgia, about three weeks before it was stolen. The purchase price was $2,995.00. He executed an Installment Sale Contract, which showed a cash down payment of $385.25 and traded in a 1968 Ford Custom automobile for which he was allowed $845.00. There is a discrepancy in the amount testified to by Duvall as to the purchase price and the amount shown on the sales contract. This discrepancy, however, is not material to the disposition of this case.

On Saturday, October 16, 1971, Duvall was issued a license tag and a tag receipt by the Probate Judge of Russell County for this vehicle being a 1972 tag, number 57–5198, and this tag was mounted on this Pontiac on that date, and was still mounted on the car when it was stolen on October 19, 1971.

On October 19, 1971, Duvall went to his place of employment at 7 A.M., parking his car in a church parking lot nearby. He locked the car and carried the key with him. He got off work at 3:30 P.M. and went to the parking lot and found the car was gone. His superintendent rode him up and down the streets of Homewood in search of his automobile. Being unable to locate it, Duvall reported the theft to the Homewood Police Department and signed a complaint. He never saw this car again.

The scene shifts from Jefferson County to Cleburne County. Lieutenant E. E. Hardegree testified that he was an investigator with the Alabama Department of Public Safety and had been so employed for approximately twenty years; that his duties dealt primarily with investigating automobile thefts and that the counties of Calhoun, Cleburne, Clay, Randolph and St. Clair were embraced in his assigned territory; that on October 19, 1971, he took part in an automobile theft investigation in Cleburne County. He testified that he was familiar with the highways, roads, bridges, and streets of Cleburne and Calhoun Counties, as well as the cities, towns and communities in these two counties. Also he was familiar with the location of the rivers, creeks, and different bodies of waters situated in these counties. A map of Cleburne and Calhoun Counties was used in connection with his testimony and other witnesses. The map was used as a reference—not an exhibit, and we do not have the benefit of it. We glean from the testimony that the map was dotted with arrows pointing in all directions—North, East, South and West—to make clear to the jury the location of highways, roads, bridges, cities, towns, communities, rivers, creeks, and other points material to the state's case. The map had blue lines to separate counties and a green line to denote wooded areas where certain officers stationed themselves for vantage points during surveillances in connection with their investigation. Had the map been introduced in evidence, it would have been a great help to us in following the testimony. Nevertheless, we will undertake to summarize the state's case.

Hardegree further testified that on the morning of October 19, 1971, he in company with another State Investigator, Sergeant Roy McDowell, and Larry Sylvester, an F.B.I. Agent, went in the vicinity of a farm in the Bells Mill Area of Cleburne County about nine and one half miles southeasterly from Heflin. To get to this farm, one would have to travel on State Highway 46 and turn on a county dirt road and cross the Tallapoosa River over a metal bridge. They went to this place in Sylvester's automobile. Hardegree got out of the car a short distance from the bridge and secluded himself in some bushes and trees about fifteen feet from the road. He was equipped with a two-way radio (walkie-talkie), binoculars and a notebook. He made notes on coming and going vehicles and the drivers of each as well as the physical outlay of the premises showing houses, buildings and a barn. He identified photographs of the buildings and roadway approaches to the farm. These

were introduced in evidence without objection.

According to this witness, the first vehicle that came to the farm was a blue pickup truck. This truck was driven by one Jackie Tant and passed the point where he was stationed at 10:50 A.M. He had known Jackie Tant in the past. Tant approached the farm from the West, crossed the bridge, continued on the dirt road to the gate, stopped and opened the gate, drove through, stopped and closed the gate, and continued down the lane toward the barn. Immediately behind the blue pickup truck was a white Oldsmobile driven by appellant. Hardegree had known appellant in the past and knew he lived in Anniston, Alabama. He pointed to him in the courtroom and identified him as the driver of the Oldsmobile. No other vehicles approached the farm until 1:10 P.M. at which time a 1970 two-tone green Pontiac Catalina came from the same direction as the pickup truck and Oldsmobile. The Pontiac bore a 1972 Alabama license plate, green in color with black numerals, the number being 57–5198, and was driven by one Billy McGullion. This witness had also known McGullion in the past and knew that he lived in Anniston. The driver of the Pontiac followed the same route that had been taken by appellant and Jackie Tant—"He continued on up the road here (indicating) to the gate, stopped, opened the gate, went through the gate, stopped the car, got out and closed the gate, and drove on down this road (indicating) in the direction of the barn, out of sight around the curve." There were now three vehicles at the barn and three men on the premises including appellant.

The sequence of events transpiring thereafter show that at 1:20 P.M. on the same day the white Oldsmobile driven to the premises by appellant around 10:50 that morning was driven from the farm by Billy McGullion who drove the Pontiac to the farm at 1:10 P.M. The Oldsmobile and McGullion were not seen again on that day. At 2:50 P.M. the blue pickup truck left the farm, traversing the route, being driven by Jackie Tant, and made an excursion around the country side, and then returned to the farm.

This witness testified that around 3:00 P.M. he heard some beating, banging and hammering coming from the direction of the barn; it sounded like beating on metal and had a metallic sound like metal being shifted and moved around on metal; that this noise continued for an hour or more and until just before he saw the pickup truck again.

At 5:50 P.M. the blue pickup, driven by Jackie Tant, left the farm loaded with the rear section of a 1970 Pontiac of the same color and description as the one that was driven to the farm by Billy McGullion. Upon being asked what comprises the rear section of the Pontiac that he was describing, he responded by saying:

> "We call the rear clip, which consists of both rear fenders, quarter panels, the top of the automobile and everything up to the dash, minus the seats."

The rear clip would also include the rear glass, but not the doors, the wheels or the frame underneath.

Hardegree stated that the license plate had been removed or was not still mounted on the rear portion of this 1970 Pontiac, green in color with a dark vinyl top. He remained at his post until approximately 7:30 P.M. and then left; that appellant had not left the premises from the time he carried in the white Oldsmobile around 10:50 A.M. on October 19, 1971, up to and including the time he gave up the surveillance that night.

Sergeant McDowell testified that he worked for the State Department of Public Safety and had been so employed for twenty years, the last eleven as an Investigator; that he was assigned to the Auto Theft Unit of the Department; that on October 19, 1971, he accompanied FBI Agent

Sylvester and Lieutenant Hardegree on an auto theft investigation in Cleburne County in the area more fully described in the testimony of Hardegree above detailed. He stationed himself in a wooded area directly behind the barn and had a clear view of the doors of the barn as there was pasture or open land between the wooded area and the barn. The point where he was stationed was roughly 75 yards from the barn. There were two doors—one large and one small—on the barn and they remained open until about 7:30 P.M. when they were closed by appellant. He, too, was equipped with a radio, binoculars and a notebook. It was established that the area where McDowell stationed himself was on lands leased to appellant under a lease—sales contract with the owner—one Billy Feazell.

As to dates, times, motor vehicles, and the individuals involved, McDowell's testimony was substantially the same as Hardegree's. However, McDowell had a clearer view of on-the-scene happenings than did Hardegree. He observed the arrival of the blue pickup truck and the Oldsmobile and identified Tant as the driver of the truck and appellant as the driver of the Oldsmobile. He observed the arrival of the 1970 two-tone green, dark top Pontiac bearing a 1972 license plate, number 57–5198, driven by Billy McGullion around 1:10 P.M. on that date. He testified that appellant and Tant were in the cabin when McGullion drove up in the Pontiac, and he saw him drive this car inside the barn, leaving the rear end sticking out. He observed McGullion open the doors to the Pontiac inside the barn, remove a jacket and throw it over his shoulder and walk to the cabin. McGuillion stayed in the cabin only a few minutes. He came out and got in the Oldsmobile and drove away. A few minutes later, he saw appellant and Tant leave the cabin and walk into the barn where they started working on the Pontiac. He heard a good deal of hammering. At 2:30 he observed appellant and Tant milling around in the barn and observed them standing in the door to the barn and talking. He saw Tant get in the pickup truck and leave the premises. He doesn't know where he went but he returned shortly and engaged in a conversation with appellant outside the barn. They went back inside the barn and he saw them with a burning acetylene torch around the Pontiac. He said he could see the flame of the torch and heard a hacksaw sawing and they were working on the Pontiac. The large door to the barn was still open. He saw Tant go to the cabin and get the pickup truck and back it partly into the barn. He observed them lift the rear clip of the Pontiac and put it on the pickup and Tant drove away from the premises; that appellant remained in the barn using the cutting torch on what was left of the Pontiac. Appellant turned the lights on inside the barn and McDowell had a close-up view (with the binoculars) of his activities. He observed appellant pull the engine of the Pontiac upon a winch inside the barn and saw him take the cutting torch and burn the seats of the Pontiac observing the flame and smoke. This witness further testified that, "as he was cutting up these pieces, he would bring them out and throw them out in front of the barn here (indicating) some against it; and it looked like he might have been throwing some out over here. (indicating)"; that appellant stayed in the barn until about 7:30 P.M. and then turned off the lights in the barn, took a flash light and closed the doors to the barn and walked to the block cabin. McDowell stayed at his post until 8:00 P. M. and knows that the blue pickup truck and the Oldsmobile did not return. At the time he left, appellant was still on the premises and what was left of the 1970 Pontiac automobile was there in the barn.

McDowell also testified that he next saw the 1972 license plate, number 57–5198, that was mounted on the Pontiac when it was driven into the barn, on the 9th of November, 1971, when he retrieved it from the Tallapoosa river with the use of a magnet tied to a rope; that the tag had been in his

possession since he got it from the river and that it was in substantially the same condition with some mud on it except that when he got it from the river it was bent double and he straightened it out. The license tag was received in evidence without objection.

The next witness for the state was Corporal Albert Henry Clifton, a State Trooper stationed in Anniston, Alabama. He testified he was assigned on an investigation in Cleburne County on October 19, 1971, at a point on a dirt road that turns off Alabama Highway 46 before you get to the Bells Mill Community; that he was familiar with the locus in quo and was personally acquainted with all the actors in this criminal drama. He arrived around noon on that date and was dropped off on a county road behind the barn by Special Agent Rodger Paulk. Upon arrival he contacted F.B.I. Agent Larry Sylvester and walked the road back through the tree line where he made contact with Sergeant McDowell. He had a clear view of the barn; that it was a red barn and was 45 to 50 feet wide and about that long. There was a huge door and a standard size door. The huge door was open and remained open all day; that the point where he was stationed was approximately 100 yards from the barn. When he first arrived he saw a blue pickup truck and a white Oldsmobile parked near a green block stucco cabin and he did not observe any people around the cabin or barn at that time. The first activity he saw was shortly after 1:00 P.M. when Billy McGullion drove a 1970 green Pontiac into the rear of the barn. He wrote the tag number in his notebook—1972 license tag number 57-5198. McGullion got out and went through the car and took out a bottle which he placed on the trunk of the car. He had a blue denim jacket slung across his shoulder. He saw him walk from the barn to the cabin where he stayed five or ten minutes and he came out and got in the Oldsmobile and drove away from the premises. A short time later he saw appellant and Jackie Tant leave the cabin and go in the barn, raised the hood of the Pontiac and appeared to be removing bolts. Shortly thereafter, Tant got in the blue pickup and left the premises. He lost sight of the pickup but could hear the motor running and it sounded like Tant was driving up and down the road. About fifteen minutes later Tant returned in the pickup to the barn. He saw appellant and Tant walking toward the tree line where he and McDowell were stationed. He and McDowell moved further back in the woods to prevent being seen. Appellant and Tant got almost to the tree line and turned around and went back to the barn and continued to work on the car. Shortly after 4:00 P.M., he observed a lighted acetylene torch and saw the flame from the torch and sparks from the metal as the metal was being cut on the car. He then saw Tant get in the pickup and back it partly into the barn where they loaded the rear section of the Pontiac on the truck and Tant drove the truck away shortly after 5:00 P.M.

This witness further testified that appellant remained there at the barn and he could hear hammering and banging. A winch was located in the barn and he saw appellant winch the motor up out of the frame. At this time it was getting dark and appellant turned the lights on inside the barn and continued to work on the motor which was hanging from a beam. The other part—front end and frame—of the Pontiac was still in the barn along with the motor when appellant cut the lights out and closed up. Clifton left the premises between 7:30 and 8:00 P.M. This witness returned to the scene the next day around 8:30 or 9:00 A.M. and stationed himself in the same area he was in the day before. At this time he saw a red Ford pickup truck backed into the stall of the barn. Near the cabin was the blue pickup truck loaded with the front section of the Pontiac, front fenders, front end and hood. He then observed appellant and Tant around the red pickup upon which was

loaded the rear axle assembly, rear end section (all one piece), and the motor. He saw Tant get in the blue pickup and drive away. Three or four minutes later appellant got in the red pickup and followed in the direction taken by Tant. This was around 9:30 on the morning of October 20, 1971. He was brought to the scene that morning by F.B.I. Agent Jay Miller in company with State Trooper Corporal Norris Waldrep.

Immediately after appellant and Tant drove the pickups away that morning, Agent Miller picked up Clifton and Waldrep and they got behind the red pickup driven by appellant and kept it under observation until it reached a garage located just north of Hollis Crossroads on Highway 431 at a point where Highway 9 intersects 431. They followed the red pickup all the way to this garage and saw it pull into an open area facing the highway. He saw appellant get out of the truck where he was met by one Herbert Turley.

From the record:

"Q. All right, did they do anything regarding these parts of this Pontiac automobile that were loaded on the truck?

"A. Well, we went on past the garage, made a pass by the garage, and there is a road, a crossroad, right there at the garage, just north of it. We made a right turn on it, which took us back over into No. 9. We came back to Hollis Crossroads and back up 431, and the truck at this time was backed into the garage with the front end facing out.

"Q. All right.

"A. We went on past and made a turn to the left this time on a road that circles around and comes back into 431. From this point right here (Indicating), we could see the garage. And we had not got around here (Indicating) good until the pickup truck come out and went north on 431.

"Q. Was anything in the pickup truck?

"A. We couldn't see anything in the rear of it from there.

"Q. Where was the blue pickup truck; did it go to the garage?

"A. After it left the farm, I don't know where it went.

"Q. Now, what did you all do after that; anything?

"A. We discontinued the surveillance and returned to Anniston.

"Q. All right, now that garage down there on 431, is it situated inside Cleburne County, Alabama?

"A. Yes, sir."

On cross-examination, Clifton testified as follows:

"Q. Did you see the defendant get down under the car?

"A. Yes, sir.

"Q. What did he have in his hands; anything?

"A. I couldn't tell really what he had in his hand; but he was under the car.

"Q. Anyway, you heard some noises?

"A. Yes, sir.

"Q. You know this was the same car that you saw McGuillion drive in there; you are sure of that?

"A. Yes, sir.

"Q. Okay. Could you see the tag on that car while all of this work was going on?

"A. Yes, sir.

* * * * * *

"Q. Now, didn't you say that somebody drove away with a section of this automobile on a truck?

"A. Yes, sir.

"Q. Who drove away with parts of this car on a truck?

"A. Jackie Tant.

"Q. Which truck was this?

"A. The blue Chevrolet pickup.

"Q. Well, when he drove away with it, that license tag was on it; wasn't it?

"A. No; they had removed the bumper off of that car.

"Q. You say the bumper was taken off?

"A. The bumper had been removed from the car when the rear section was taken off.

"Q. Who did that?

"A. Both, Mrs. Whistenant and Mr. Tant.

"Q. Did you watch them do that?

"A. Yes, sir."

Jay Thomas Miller, Special Agent with the Federal Bureau of Investigation, testified that on October 19, 1971, he drove his F.B.I. automobile into Cleburne County and went to a farm or in the vicinity of a farm ten miles east of the Town of Heflin. He was alone and arrived at the scene about 1:30 or 1:45 in the afternoon. He stationed himself in his car on a county road about one-half mile from the actual location of the farm in question. He had binoculars. He later moved his position and stopped on a little dirt trail right off Highway 46 near where the farm road runs out on to 46. Around 5:45 or 6:00 P.M. he observed a 1964 or 1965 blue Chevrolet pickup truck come down the hard-surface road, which leads to the farm, and it was carrying the rear portion of a late model automobile, green in color, with a dark top—either black or dark green. He further testified:

"Q. All right, and what happened; which way did it go then?

"A. It turned south on Highway 46. I observed it. I was down at this location (Indicating); and I observed it with binoculars as it did come down the road. Once it turned south on Highway 46, I got in my vehicle and proceeded to follow the pickup truck at some distance. I followed it down to County Road 42; down 46 to County Road 42, where we turned generally west and continued on County Road 42 until we hit County Road 19, which is right here (Indicating). Then, we turned south and went, it looks like about a mile, down this road; again turned west and continued to follow the vehicle until the vehicle came to be located at a garage on Highway 431."

He said it took about twenty minutes to make the trip to the garage which was located about a mile north of the intersection of Highway 9 and 431, there by a little store. He last saw the pickup parked at the rear of this garage with the section of the green automobile on it. He did not see anyone around the truck or the garage.

This witness said he returned to the vicinity of the farm the next morning, October 20, 1971, around 8:00 A.M. with two other officers (Clifton and Waldrep). He let one officer off near the bridge and then followed a county road around to a point on the west side of the farm where the other officer got out of the car. He positioned himself in his vehicle on another dirt trail off the county road. At 9:30 A. M. he picked up the first officer he let off and picked up the second officer and they proceeded to follow a red pickup truck

from the location on the farm all the way down to the garage at the intersection of Highway 9 and 431 and the red truck pulled into the same garage that the blue pickup truck pulled into the day before.

Further,

"Q. After the red pickup got to the garage on the 20th, did you do anything else in regard to all of this?

"A. We passed the garage and I saw an individual getting out of the truck. I went on and continued on 431 a short distance, turned around, made another pass by the garage; and at this time, the pickup truck was backed in one of the stalls of the garage. I continued on down to the intersection of 9 and 431, waited a little while, made another pass; and at that time the pickup had just pulled off and had just left the garage area.

"Q. So, what did you do after that; anything?

"A. After that we discontinued our investigation and returned to Anniston."

The next and last witness for the state was Herbert Turley. He was under indictment in more than one case involving automobiles. The trial court advised him of his rights under the law and the Constitution of the United States. He was advised that he had a right not to incriminate himself; the right to consult an attorney; the right to stop testifying any time he wished; that his testimony might be used against him, and that anything he might say in this case could be used as evidence against him as evidence in the pending cases against him. The witness said he fully understood his rights and he wanted to testify. Upon determining that the witness' desire to testify was voluntary and of his own free will, intelligently and understandably made, the court permitted him to testify.

The record reflects:

"BY MR. COOK:

"Q. Before we get into any facts, I want to ask you something. Has any officer, sheriff, investigator, prosecutor, judge, city policeman, promised you any kind of reward or hope of leniency or hope of probation, or anything like that, to get you to testify in this, or any case?

"A. No, sir, they haven't.

"Q. You talked to me about this case Sunday evening; did you not?

"A. Yes, sir.

"Q. And you talked to some of these officers about it when they asked you about it?

"A. Yes, sir.

"Q. During any of these conversations with me or anybody else, was any mention ever made that you would get any better treatment than anyone else who might be involved in this matter?

"A. No, sir."

Turley testified that he was a body, fender and paint man by trade; that in August, September, and October, 1971, he was employed at a garage on Highway 431 in Cleburne County; that he was not self-employed but was hired by Mr. Jimmy Haynes. He was not paid by the hour or day but by the job; that he was working at this garage on October 19 and 20, 1971, when parts of the late model green Pontiac were brought to the garage by Jackie Tant in a pickup truck. He said he put these parts on a total wreck that he was fixing. The car he was working on was a four-door Pontiac that had been hit hard in the rear but the front end was good. He said

he was working on a four-door Pontiac and they brought him a two-door tail section to make a two-door out of it; that he rebuilt the wreck by using parts of the rear end of a Pontiac that Tant brought to him. He testified that he completely rebuilt the car and was in the process of painting it when the officers showed up and that ended his work on the car. He said he did not know where the rear section of the Pontiac came from that was delivered to the garage by Jackie Tant.

The state rested and appellant made the following motion:

"MR. WILKERSON: We would like to —since the State has closed its case, we would like to move to exclude the evidence and assign grounds as follows, may it please the Court; The corpus delicti hasn't been proven. Secondly, there has been a material variance in that the indictment alleges that the owner of the stolen vehicle in question is named Otis C. DuVall; and the testimony has shown that the name of the owner of the automobile in question is Otis C. DuVall, Jr. And, we respectfully submit that is a material variance. As our third grounds on the motion to exclude, we would point out that the State has seen fit to allege the specific motor vehicle identification number of the automobile as part of the description of the stolen property in the indictment. It is our position that when they alleged that, they have to prove it with sufficient competent legal evidence. We respectfully submit that the only evidence relevant to that motor vehicle number is hearsay evidence, and it has not been proved. And moreover, it has not been proved that the identification number alleged in the indictment was, in fact, the identification number on the automobile allegedly in the possession of the defendant. Fourth, we move to exclude and assign insufficient, or insufficiency (sic) of legal evidence to show that the automobile allegedly stolen from Otis DuVall was, in fact, the property that the defendant was charged with buying, receiving, concealing or aiding in concealing. So, for those four reasons, we move to exclude.

"THE COURT: I overrule your motion.

"MR. WILKERSON: We except. Also, for the record, we advise the Court that we are going to rest when the jury returns; and we will submit to you two affirmative charges.

"(Whereupon, the jury was returned to the jury box, and the following proceedings were had:)

"MR. WILKERSON: For the record, the State having rested with the testimony they put on, we rest too."

We have gone to great pains to set out the evidence in detail in the light of appellant's motion to exclude the state's evidence.

We start with the statement that this is not a search warrant case. Neither was there an arrest warrant. Moreover, there was no *seizure* of property by the officer. The Grand Jury returned a True Bill based upon the testimony as hereinabove set forth.

There was no error in overruling the demurrer to the indictment. The indictment is in the language of the Statute (Title 14, Section 338, Code of Alabama 1940) and contains all of the constituent elements of this offense. Farzley v. State, 231 Ala. 60, 163 So. 394; Franklin v. State, 47 Ala.App. 62, 249 So.2d 882; Johnson v. State, 41 Ala.App. 351, 132 So. 2d 485.

Appellant complains that the trial court committed reversible error in allowing in evidence the license tag receipt issued to Otis Duvall, Jr., without proper authentication. The tag receipt is as follows:

"COPY COPY COPY

1971 Tag Ga. PASSENGER VEHICLE 1972 Tag 57-5198

STATE OF ALABAMA
Russell COUNTY

State and County Tax $
City Tax $
Other Tax $

This is to certify
that Otis C. Duvall, Jr.
St. or R.F.D. No.
510 - 25th St.

City or Town
Phenix City

has paid to me for Motor Vehicle license tax year ending September 30, 1971

Penalty $
Citation
Int

Amount of License $13.00
Issuance Fee .75
Total $13.75

| Make | Year | Model | Type Body | Vehicle Identification No. |
|---|---|---|---|---|
| Pont. | 70 | Cat. | | 252370P101096 |

License Plate Issued Herewith Bears the Same Number As this Receipt

This the 16th day of Oct. 19 71

Signature of
Licensee: S/ Otis C. Duvall, Jr.

Judge of Probate
By S/ JB

This Receipt To Be Mailed on Date of Issuance To State Dept. of Revenue, Montgomery, Ala."

A license tag receipt is not an instrument required to be admitted to record by our recording statutes. Title 47, Section 95, Code of Alabama 1940.

Statutes providing for the licensing and registration of motor vehicles were enacted in the interest of the public welfare and require such registration for the purpose of exercising control over the use of highways and placing on the public records a means of identifying a vehicle and its owner, and is generally regarded as police regulations.

Alabama does not have a title registration law for motor vehicles. The requirement for license tags or plates on motor vehicles comes from our Revenue Statutes.

Every private passenger automobile, when operated upon the public highways of Alabama, must have a proper license tag securely attached to the rear of the vehicle right side up with the numbers thereof in an upright position and plainly visible. Title 51, Section 693, Code of Alabama 1940, as last amended.

Title 51, Section 704, Code of Alabama 1940, provides that no license shall be issued to operate a motor vehicle on the public highways of this state until the ad valorem taxes shall have been paid. Before

any vehicle can be assessed, the tax assessor shall be furnished the tag number presently on the vehicle (unless the vehicle is new and no tag has been purchased, in which event a bill of sale must be furnished). In the event a used car is brought into the state, the assessor must be furnished a bona fide certificate of title properly assigned. Subsection (b) of this section provides that the Judge of Probate upon issuing such license shall require the applicant to surrender the receipt of the tax collector and keep it on file in his office. A copy is sent to the State Department of Revenue. The license tag is evidence of the payment of the license and the ad valorem tax due.

It is obvious that the above sections of Title 51 are revenue measures and nothing more, but there are penalty sanctions for operating automobiles on the public highways without a proper license tag properly mounted on the vehicle. Title 36, Section 75, Code of Alabama 1940, as last amended.

Since there is no motor vehicle title registration law in this state, a tag receipt bearing the number on the license plate and the identification number of the vehicle is indicia of title and evidence of ownership. A bill of sale or a license tag are two methods of proving ownership and the right to possession of a motor vehicle. Scott v. Parker, 216 Ala. 321, 113 So. 495. An official tag receipt is, therefore, original and primary evidence denoting title to a motor vehicle and is admissible evidence without further proof. This proof of registration raises a presumption that the car belonged to the registered owner but this presumption may be entirely overcome by countervailing testimony. Ala.Dig. "Automobiles", ⚿242(5). The license tag receipt was properly admitted in evidence.

There is no merit in appellant's contention that there was a material variance in the indictment as to the ownership of the stolen automobile and the proof. The indictment alleged the car belonged to Otis C. Duvall, whereas the proof offered showed the title to be in Otis C. Duvall, Jr.'s name. The word "Junior" or "Jr.", or words of similar import, are ordinarily mere matters of description, and no part of a person's legal name. Taylor v. State, 282 Ala. 567, 213 So.2d 566.

The protection of the Fourth Amendment securing people in their persons, houses, papers and effects against unreasonable search and seizure does not apply to "open fields". Edwards v. United States, (10 Cir.) 206 F.2d 855; Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; United States v. One 1967 Dodge Pickup Truck, (D.C.) 310 F.Supp. 773.

The Fourth Amendment does, however, apply to buildings *within the curtilage* which may include "a garage, Taylor v. United States, 286 U.S. 1, 52 S.Ct. 466, 76 L.Ed. 951; a barn, Walker v. United States, (5 Cir.) 225 F.2d 447; a smokehouse, Roberson v. United States, (6 Cir.) 165 F.2d 752; a chicken house, Walker v. United States, (5 Cir.) 125 F.2d 395, and similar property. Whether the place to be searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family." Care v. United States, (10 Cir.) 231 F.2d 22 (Emphasis added).

In Hester v. United States, supra, revenue officers concealed themselves from fifty to one hundred yards away from Hester's father's house and observed Hester come out of the house and hand a quart bottle (of moonshine) to a customer. The officers moved in and arrested Hester and confiscated the whisky. At trial there was a motion to exclude the evidence as well as a motion for a directed verdict because his rights under the Fourth Amendment were violated. In disposing of Hester's contentions, Mr. Justice Holmes, speaking for the court, said

"* * * The officers had no warrant for search or arrest, and it is contended that this made their evidence inadmissible, it being assumed, on the strength of the pursuing officer's saying that he supposed they were on Hester's land, that such was the fact. It is obvious that even if there had been a trespass, the above testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. This evidence was not obtained by the entry into the house and it is immaterial to discuss that. The suggestion that the defendant was compelled to give evidence against himself does not require an answer. The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, the special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers and effects,' is not extended to the open fields. The distinction between the latter and the house is as old as the common law. 4 Bl. Comm. 223, 225, 226."

The testimony is uncontradicted that, though some of the officers were apparently, physically, on lands under a lease-sale agreement to appellant, they never at any time got closer to the barn than seventy-five (75) to one hundred (100) yards. Their positions along the tree line during their surveillance, from that distance, gave them a clear and unobstructed view across an open field to the place (barn) where criminal activity was plainly observed. The factual situation brings this case squarely within the holding in *Hester*, supra, and that case is controlling here.[1]

*Hester* was cited in Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576. We take the following from Mr. Justice Harlan's concurring opinion:

"As the Court's opinion states, 'the Fourth Amendment protects people, not places.' The question, however, is what protection it affords to those people. Generally, as here, the answer to that question requires reference to a 'place.' My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. Cf. Hester v. United States, supra."

In Smith v. State, 41 Ala.App. 528, 138 So.2d 474, the Court said:

"* * * A search implies a probing into secret places for that which is hidden; it implies force, actual or constructive; or a forceable dispossession of the property of one by exploratory acts. Kelley v. State, 39 Ala.App. 572, 105 So.2d 687."

In Atwell et al. v. United States, 414 F.2d 136, the Court of Appeals, Fifth Circuit, held that a trespass does not of itself constitute an illegal search. The *Atwell* court further said:

"The record shows that the still in question was located approximately 250 yards

1. The case of Brown v. State, 48 Ala.App. 84, 261 So.2d 914, does not have a headnote indicating that this Court has held that the Fourth Amendment privilege does not extend to "open fields".

from the back of a house in the open land beyond the curtilage of the house. Appellants argue that the Government should have proved that there was not an unlawful search or seizure before being allowed to introduce any testimony regarding what the officers saw at the still site. But inasmuch as the protection of the Fourth Amendment against unreasonable searches and seizures does not extend to 'open fields,' there was no unreasonable search. See, e. g., Hester v. United States, 1924, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898; Monnette v. United States, 5th Cir. 1962, 299 F.2d 847. Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search. Monnette v. United States, supra; United States v. Young, 4th Cir. 1963, 322 F.2d 443. Accordingly, it was not error for the trial court to admit testimony regarding what the officers saw at the still."

In United States v. Hanahan, 442 F.2d 649, the Court of Appeals, Seventh Circuit, affirmed a robbery conviction relying on *Atwell*. There the court said:

"Defendant seems to contend that his curtilage included a 'few inches of grass between the sidewalk and the garage itself,' and that Hanhardt stood on this strip of grass when he looked into the service door window. This premise is based upon what defendant professes to discern from photographs, contrary to the officer's testimony. Even if this dubious premise be accepted, it was no more than a technical trespass on the part of the officer. The court in Atwell v. United States, 414 F.2d 136, 138 CA-5) stated:

'Moreover, even if the officers were trespassing on private property, a trespass does not of itself constitute an illegal search.'

To the same effect see United States v. Polk, 433 F.2d 644, 648 (CA-5), and Monnette v. United States, 299 F.2d 847, 850 (CA-5).

"A case even more in point is McDowell v. United States, 383 F.2d 599 (CA-8), where the officers on one occasion obtained information as to what took place while they were located on the curtilage of defendant's premises. As to that incident, the court stated (page 603):

'At that time the agents merely recorded the names of those persons coming out of the north field and visually observed their clothing. This did not constitute a search, Fagundes v. United States, 340 F.2d 673, 676 (1st Cir. 1965) and no seizures for the purposes of obtaining evidence took place within the curtilage.'

"The fallacy of defendant's curtilage theory is that the mere obtaining of information did not constitute a search or seizure. We hold that the court properly denied defendant's motion to suppress."

Adverting to the barn which housed the stolen automobile before it was dismantled, we have pointed out that the barn door, large enough for a car or pickup truck to enter and leave, was wide open at all times when appellant, with torch, was observed cutting the car in two. Had he expected "privacy", and "to be let alone", he would not have exposed his activities to the "plain view" of outsiders. His Fourth Amendment rights dictated that he should have closed the barn door. There was no error in overruling appellant's objections to the testimony of all officers.

Appellant also contends that his Fifth Amendment rights against self-incrimination were violated by the prosecutor in his summation to the jury. From the record:

"MR. COOK: — Hugh Gray Whistenant knew that was a stolen automobile when he—

"MR. WILKERSON: We object to that.

"MR. SMITH: We object to the repetitious use of that; it seems to be the prosecutor's idea to inflict guilt by association. We ask that the Court instruct

this District Attorney not to use this line of argument.

"THE COURT: Overrule.

"MR. WILKERSON: We object to the statement, 'I am still waiting for an explanation.' We object to it as being an unlawful comment. We would like to make a statement for the record, subject to being corrected. The statement, as we understood it, was, 'Until there is some reasonable explanation from the witness stand, then you could convict the defendant, and I am still waiting for an explanation.' Is that what was said, for the record?

"MR. COOK: I did.

"THE COURT: I don't remember 'from the witness stand.' I was trying to get it in my mind whether it was.

"MR. PARKER: Could we ask the D.A. from the witness stand?

"THE COURT: I remember him saying that he was still waiting for evidence but —

"MR. PARKER: Could we ask him?

"THE COURT: Did you say 'from the witness stand'?

"MR. COOK: I think I did.

"MR. PARKER: We object to that as being unlawful comments.

"THE COURT: All right, don't make unlawful comments. Are you making an objection?

"MR. WILKERSON: Yes, sir; at this point, we are objecting.

"THE COURT: I overrule your objection."

Immediately following the above the trial court instructed the jury orally in part as follows:

"Title 15, Section 305 of the Code says, 'On the trial of all indictments, complaints, or other criminal proceedings, a person on trial shall, at his own request but not otherwise, be a competent witness; and his failure to make such a request shall not create any presumption against him or be subject of comment by counsel.' Gentlemen, this statute is to the effect that a defendant may elect to not testify; and if he does not so elect, his failure to testify in his own behalf shall not create any presumption against him, and gives a defendant a substantive right which you Gentlemen, under your oath, are bound to respect and uphold. This statute means exactly what it says; and it would be highly improper and unjust for you to disregard this statute in arriving at your verdict. One of the fundamental principles of our democracy is that a person shall not be deprived or (sic) life or liberty except by due process of law; and for a jury to convict a defendant by disregarding this statute when it would not otherwise convict him would be contrary to all of our democratic concepts of justice and fair play, and in addition, Gentlemen, it would be a violation of the solemn obligation of the jury that you voluntarily assumed when you entered upon the trial of this case."

The statement of the Special District Attorney does not refer to the fact that the appellant did not take the witness stand. The statement amounts to no more than the prosecution's evidence is uncontradicted. Numerous cases from this court and the Supreme Court have been written on this subject. The import of these cases is that to constitute error there must be a direct reference to the failure of the defendant to testify. Williams v. State, 43 Ala.App. 343, 190 So.2d 556; Broadway v. State, 257 Ala. 414, 60 So.2d 701; Swain v. State, 275 Ala. 508, 156 So.2d 368; Vinet v. State, 38 Ala.App. 299, 83 So.2d 357.

We have carefully searched the record for error—any error affecting the substantial rights of appellant and have found none. This case is due to be affirmed and it is so ordered.

Affirmed.

All the Judges concur.