The appellants, Richard M. Maddox, Vickie Ellen Callahan, and Gary Dean Gillum, were arrested on June 10, 1982, and charged with violating the Alabama Uniform Controlled Substances Act. Ala. Code 1975, § 20-2-1 through 20-2-144. Appellants Maddox and Gillum were specifically charged with trafficking in cannabis, in violation of § 20-2-80, and appellant Callahan was specifically charged with possession of marijuana, in violation of § 20-2-70. Indictments were returned against each appellant, by the June 1982 term of the Coosa County Grand Jury, indicting each with the violation for which they were initially charged.
On December 2, 1982, Maddox was found guilty of trafficking in cannabis by a Coosa County jury. Following an unfavorable pre-sentence report, Maddox was sentenced to a term of fifteen years in the penitentiary. On November 28, 1983, eleven months after Maddox was found guilty, Callahan pleaded guilty to felony possession of marijuana and was sentenced to three years' imprisonment. On the same day, Gillum pleaded guilty to trafficking in cannabis, and was sentenced to four years' imprisonment. In a supplemental plea agreement, the State, with apparent approval of the trial court, agreed that Callahan and Gillum retained the right to appeal the legality of the search which led to the obtaining of evidence against the appellants.
Subsequent to this agreement, Callahan and Gillum moved to consolidate their appeals with that of Maddox. A similar motion was made by the State. All appellants are represented by the same attorneys on appeal. The motions to consolidate were granted by this court on November 7, 1984.
On his appeal, Maddox questions the legality of the search and seizure of evidence which led to his conviction. At trial his motion to suppress, after a hearing thereon, was overruled by the trial court. In a supplemental brief filed on behalf of Callahan and Gillum, they raise the same issues presented for review by Maddox. Resolution of the issues raised by Maddox will be dispositive of the issues raised by Callahan and Gillum.
On June 9, 1982, Officer David Windsor, an investigator with the Coosa County Sheriff's Department, received information that marijuana was being grown on premises *Page 781 
subsequently determined to be occupied by Maddox, Callahan, and Gillum. Based upon this information, Windsor and Coosa County Deputy Sheriff Terry Browning proceeded to the property. Windsor and Browning approached from a dirt road south of the property and observed what Windsor described as a "normal farmhouse scene."
Windsor testified that he observed a dwelling house, shed, garage, and chicken house, all grouped in the same general area. The chicken house was located 15 to 20 feet from the dwelling. Attached to the east side of the chicken house was a greenhouse-type structure "covered with corrugated fiberglass." Windsor and Browning observed this scene from a wooded area south of the buildings and beyond an "old fence," which encircled the property. This fence was described as "old," but not decayed. Windsor testified that the fence was approximately 200 to 300 feet south of the buildings. J.M. Keel, a land surveyor, testified that the fence was 400 to 425 feet from the greenhouse.
After observing the general area, the deputies then walked along the "edge of the woods" in a westerly direction, to a position due south of the greenhouse. In order to get a better view, Windsor then crossed the fence and concealed himself in some bushes along the edge of a pond which was on the property. From this position, Windsor studied the scene with the aid of a pair of binoculars. Windsor testified that with the aid of the binoculars he observed "a couple of small plants," which he recognized as marijuana, growing outside the greenhouse doors.
Windsor then moved closer to the greenhouse and hid behind a pickup truck parked in front of the greenhouse. Windsor observed two more marijuana plants growing outside the greenhouse. The greenhouse had two large doors which were open; however, a plastic partition with large slits hung at the opening. Windsor could see into the greenhouse and observed more marijuana plants. The deputies then left and obtained a search warrant based on Windsor's observations.
On June 10, 1982, Windsor and five other law enforcement personnel returned to the property to execute the search warrant. The warrant was directed to Gillum as owner of the property. His ownership was indicated by the county tax assessor's records. Maddox, Callahan, and Gillum were found in the greenhouse. Windsor testified that, upon being arrested, Maddox stated, "I don't guess that was such a good idea after all." During a search of the residence, marijuana was found in almost every room. The appellants accompanied the officers during the search, and Windsor testified that Maddox identified one of the bedrooms as being his. The two other bedrooms were identified as belonging to Callahan and Gillum. Maddox also claimed ownership of some "cash money" which was in the room identified as his. In reference to the money, Maddox purportedly stated to Windsor, "I have just gotten my check cashed. That doesn't have anything to do with this." Maddox did not take the stand in his own behalf either on the motion to suppress or at trial. He offered no evidence at trial and his defense consisted of a probing and searching cross-examination of the State's witnesses and arguments to the jury.
On appeal the appellants contend that the search warrant was improperly issued and therefore that no evidence resulting from the search would be admissible against them. Appellants do not question the facial sufficiency of the affidavit nor do they dispute the evidence presented to the magistrate to support a finding of probable cause for the issuance of the search warrant. Rather they contend that all the evidence before the magistrate was obtained by the officer in violation of their Fourth Amendment rights, and, therefore, that it was improper for the magistrate to consider it in making a determination of probable cause. The State's sole argument is that Maddox did not have standing to contest the search; it neither addresses the validity of the search nor the issues as raised by Callahan and Gillum. *Page 782 
 I
In contending that the evidence seized pursuant to the search warrant should have been suppressed, it is argued that Windsor's actions in gaining his information for the magistrate's probable cause determination constituted a search; that this warrantless search could not be justified as falling within the "open fields" or "plain view" doctrines; and that, therefore, the evidence obtained should not have been used to secure the warrant. In effect, the appellants contend that the two doctrines do not operate to allow Officer Windsor's observations to be utilized as probable cause to support the issuance of the search warrant. We agree that the cited doctrines are inapplicable to the facts of this case; however, we view the inapplicability of these doctrines as having no effect on the issuance of the warrant.
Our analysis will first focus on Officer Windsor's initial observations from his position near or at the pond. We will then discuss the ramifications of Officer Windsor's second position closer to the greenhouse. As will be seen, Officer Windsor did not violate any of the appellants' Fourth Amendment rights until he crossed the constitutionally protected threshold of the curtilage in order to obtain a better view of the plants he had previously identified as marijuana.
 A.
When Officer Windsor positioned himself near the pond and spotted the two marijuana plants growing outside the greenhouse, he was not in a factual situation in which the "plain view" doctrine would have been applicable. This doctrine allows government agents to make warrantless seizures under certain well defined circumstances. See Myers v. State,431 So.2d 1342 (Ala.Cr.App. 1982), cert. quashed, 431 So.2d 1346
(Ala. 1983). See also Moylan, The Plain View Doctrine, 26 Mercer L.Rev. 1047 (1975); W. LaFave, Search and Seizure, § 2.2 (1978). We view the facts of the case at bar as a situation more appropriately designated as an "open view" in which Fourth Amendment protections do not operate. See Texas v. Brown,460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); Scales v.State, 13 Md. App. 474, 284 A.2d 45 (1971).
Appellant secondly contends that the "open fields" doctrine does not apply. The "open fields" doctrine allows government agents to make warrantless seizures of property in open field areas. "The special protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects', is not extended to open fields." Hester v. United States,265 U.S. 57, 59, 44 S.Ct. 445, 446, 68 L.Ed. 898 (1924). Appellant does not argue that the pond was within the curtilage of the home, and the tendency of the evidence would not support such a finding given, its great distance from the residence. As stated by Judge Moylan, The Fourth Amendment Inapplicable, 1 S.Ill.U.L.J. 75, 83 (1977), "The clear teaching of Hester is rather that in open fields, the Fourth Amendment is inapplicable and that non-compliance with its dictates is therefore, immaterial." The clear pronouncement of Hester was recently reaffirmed by the United States Supreme Court inOliver v. United States, 466 U.S. 170, 178, 104 S.Ct. 1735,1741, 80 L.Ed.2d 214 (1984), where the Court stated that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." Furthermore, it is made clear by the teaching of Oliver, 466 U.S. at 184,104 S.Ct. at 1744, that the fact that Officer Windsor was trespassing when he observed the two marijuana plants, has "little or no relevance to the applicability of the Fourth Amendment." See also, Whistenant v. State, 50 Ala. App. 182, 278 So.2d 183, cert. denied, 291 Ala. 802, 278 So.2d 198, cert. denied,414 U.S. 1066, 94 S.Ct. 573, 38 L.Ed.2d 470 (1973). It is clear that Officer Windsor could legitimately search the open fields surrounding the property without violating any Fourth Amendment rights, because "[t]he Fourth Amendment is simply not 'out there' in the open fields." Moylan, *Page 783 The Fourth Amendment Inapplicable, at 92. See also Skipper v.State, 387 So.2d 261 (Ala.Cr.App.), cert. denied, 387 So.2d 268
(Ala. 1980).
 B.
The testimony of Officer Windsor established that the residence, garage, shed, chicken house, and greenhouse were all in relatively close proximity to each other. Officer Windsor described it as a "normal farmhouse scene" situated on approximately forty acres of land, enclosed by barbed wire fencing. Mr. C.M. Keel testified that he observed the presence of several "no trespassing" signs around the boundary when he surveyed the property. Officer Windsor denied seeing any signs. When Officer Windsor approached the greenhouse, he had to calculate his position in order not to be seen by persons occupying the residence, which was located 15 to 20 feet from the chicken house which had the greenhouse appended to it. This chicken house was located south of the residence, and another, smaller building was situated on the north side of the residence. The front door of the residence faced east. The pond was located south of the chicken house/greenhouse, and Windsor positioned himself on the east end of the pond. Officer Windsor was therefore observing the front of the residence and chicken house/greenhouse. A truck, which Officer Windsor hid behind when he approached for a closer observation, was parked in front of the chicken house/greenhouse.
In Whistenant v. State, 50 Ala. App. at 194, 278 So.2d at 194, this court stated:
 "The Fourth Amendment does, however, apply to buildings within the curtilage which may include 'a garage . . .; a barn . . .; a smokehouse . . .; a chicken house . . .; and similar property. Whether the place to be searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family.' Care v. United States (10 Cir.) 231 F.2d 22."
See also Skipper v. State, supra. The evidence adduced at trial clearly established that the chicken house/greenhouse was within the curtilage of the residence. No Fourth Amendment violation occurred until Officer Windsor made this warrantless entry into a constitutionally protected area. As stated by Judge Moylan:
 "When the policeman stands outside the constitutionally protected area and looks inside, his constitutionally legitimate observations simply give him probable cause. Some additional predicate is necessary for him then to cross the threshold.
 "In the case of fixed premises, all the probable cause in the world will not justify a warrantless entry. Coolidge [v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971),] was very clear on that point. . . ."
Moylan, The Plain View Doctrine, 26 Mercer L.Rev., at 1098.
 II
Having determined that Officer Windsor encroached upon the curtilage without a warrant in violation of the Fourth Amendment protection against unreasonable searches, we must now determine whether this violation invalidated the warrant and, consequently, whether the evidence seized should have been suppressed.
In the case sub judice, the warrant affidavit states in pertinent part:
 "Before me, Robert J. Teel, Jr., a district court judge, personally appeared David E. Windsor, a law enforcement officer, who being duly sworn deposes and says that on this, the 9th day of June, 1982, he has personally seen in plain view and within the last twenty-four hours and has probable cause to believe and does believe that there is now being cultivated marijuana plants . . . upon the premises of, to-wit: Gary Dean Gillum. . . ."
This affidavit was typed by Windsor and taken to judge Teel, who issued the search *Page 784 
warrant. Windsor swore, under oath, to the truth and correctness of the affidavit and discussed additional facts with the Judge which were not detailed in the affidavit.
During the suppression hearing, defense counsel extensively cross-examined Windsor about his testimony before Judge Teel. The pertinent part of the record reflecting this cross-examination is as follows:
 "Q. . . . All right. With the information that you then had you came down, Mr. Windsor, and talked with Judge Teel?
"A. On the 9th.
 "Q. On the 9th, and swore to the pertinent aspects for the purpose of getting a search warrant?
"A. Yes, sir.
 "Q. And everything that you told him is within the four corners of this warrant here?
"A. No, sir, not everything.
 "Q. Well, the pertinent materials are within the four corners of this warrant?
"A. There was other information mentioned.
"Q. What other information did you give him?
 "A. That there was a greenhouse and there was marijuana growing in it.
"Q. Is that all?
 "A. I don't remember everything that was said but there were other things.
 "Q. Whatever you recall, I would like for you to tell us what you recall.
 "A. I told him to the effect that there was a large greenhouse up there on the side of the chicken house and that there was marijuana growing in it. "Q. All right. Anything else?
"A. Not that I recall.
 "Q. All right. So what you told him is those things you have just mentioned — and of course you said in here that you had seen it?
"A. Yes, sir.
 "Q. All right. And what you have told him, that was typed up and that you swore to?
"A. Yes, sir.
"Q. For the purpose of getting a search warrant?
"A. Yes, sir, that's right.
". . .
 "Q. You came back — called somebody, I know that, but eventually came back to the courthouse and saw Judge Teel and told him that you had seen plants on the property of Gillum — whatever Gillum's last name is, is that right?
"A. Told Judge Teel that?
"Q. Yes, sir.
"A. Yes, sir.
 "Q. You didn't tell him you had already been on that man's property, did you?
"A. I told him I had seen the plants.
 "Q. All right. But you didn't tell him you had seen them from an opening on the property up next to the property?
"A. I don't know whether I told him that or not.
". . .
 "Q. Then you typed it up and went out to Judge Teel's house. What time of night, please, sir?
 "A. I arrived at his house sometime shortly before twelve midnight that night. After we talked for a while, when he was ready to sign it.
 ". . . "Q. But, at any rate, you wanted to search a garage, two chicken houses, and any and all outbuildings of this same residence? That's what you wanted to search, what you told the judge you wanted to search?
"A. Yes, that's what I wanted to search.
 "Q. And that was what was these things right here, isn't that true? (Indicating)
"A. Yes, sir."
"Q. Is that what you wanted to search?
"A. Yes, sir."
 "Q. And at the time you told the judge that, you had already been up there and seen in the slits, had you not?
"A. Yes, sir.
 "Q. And you had seen those plants right there inside the fenced part but *Page 785 
before you get to that flapping area? You had seen those plants in there, hadn't you?
"A. Yes, sir."
Our review of the affidavit and testimony leads us to conclude that the search warrant was not invalidated by the illegally obtained information, for it is clear that the tainted information was not included in the warrant affidavit. There is no specific reference in the affidavit to the observations of marijuana growing in the greenhouse, although this information was communicated to Judge Teel outside the affidavit. The affidavit states that Windsor saw "in plain view" marijuana being cultivated on the property. Obviously Windsor's non-technical use of the term "plain view" is synonymous with the term "open view." The only plants which could be said to be in "open view" were the two initially observed by Windsor from the pond. We believe that the facts alleged in the affidavit refer to the officer's untainted observations of the marijuana plants growing outside the greenhouse. This is supported by his testimony quoted above, wherein he, in effect, states that the information given the magistrate concerning the marijuana plants in the greenhouse was not included in the "four corners" of the affidavit. Even if the tainted evidence had been included in the affidavit, it would not have necessarily rendered the resulting warrant invalid. United States v. Giordano, 416 U.S. 505,94 S.Ct. 1820, 40 L.Ed.2d 341 (1974); United States v. DiMuro,540 F.2d 503 (1st Cir. 1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 733,50 L.Ed.2d 749 (1977). In the recent case of United States v.Karo, 468 U.S. 705, 104 S.Ct. 3296, 3303, 82 L.Ed.2d 530
(1984), a case involving electronic surveillance, the Court determined that monitoring the beeper in a private residence not open to visual surveillance, violated the petitioner's Fourth Amendment rights. The Court then stated:
 ". . . That information, which was included in the warrant affidavit, would also invalidate the warrant for the search of the house if it proved to be critical to establishing probable cause for the issuance of the warrant. However, if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid."
Id., 468 U.S. at 719, 104 S.Ct. at 3305. See also Neary v.State, 384 So.2d 881 (Fla. 1980).
Thus, assuming arguendo that the affidavit's averments can be interpreted to include information gained from the tainted observations, the search warrant is not invalidated because this illegal information was not critical to establishing probable cause. The affidavit obviously includes the untainted evidence of Windsor's initial observations of the two marijuana plants. This information was sufficient to establish probable cause. More than a mere suspicion of illegal activity resulted from an observation of two marijuana plants growing outside what appeared to be a greenhouse. The information obtained by Windsor's closer observation was merely cumulative of the information he had already obtained. As stated in United Statesv. Epstein, 240 F. Supp. 80, 83 (S.D.N.Y. 1965):
 "This is not to say that law enforcement officials may with impunity include impermissible matter in applications for search warrants in the hope that a Commissioner might thereby be persuaded to find probable cause where otherwise none exists or the issue is in doubt. . . . But in a case like the present one, where the challenged matter is merely cumulative, no such danger is run and the warrant may be upheld."
See also United States v. Sterling, 369 F.2d 799 (3d Cir. 1966) (quoting Epstein with approval).
Where a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical rather than a common-sense manner, and should resolve doubtful or marginal cases according to the preference to be accorded to warrants. United States v.Ventresca, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); 68 Am.Jur.2d *Page 786 
Searches and Seizures § 64 (1973). Great deference should be given to a magistrate's determinations. Illinois v. Gates,462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); Houk v. State,455 So.2d 115 (Ala.Cr.App. 1984), cert. denied, 455 So.2d 115
(Ala. 1984); Waters v. State, 357 So.2d 368 (Ala.Cr.App.), cert. denied, 357 So.2d 373 (Ala. 1978).
It is our judgment that the affidavit supporting the search warrant met the constitutional requisites, and the resulting search of the property was permissible. We hold that the trial court did not err when it overruled appellant Maddox's motion to suppress. The evidence seized was properly admitted into evidence at appellant Maddox's trial. It would not have been proper to suppress the evidence seized with respect to any of the appellants.
 III
Having found that the search was made pursuant to a valid warrant, we find it unnecessary to address Maddox's contention that the statements he made during the search should have been suppressed as being the fruit of an unlawful search and seizure.
 IV
As we have pointed out, the sole contention of the State is that Maddox did not have standing to object to the search and seizure. In view of our findings above, we deem it unnecessary to address the questions of standing raised by the State on appeal.
We have considered appellant Maddox's contention that the trial court abused its discretion in sentencing him to fifteen years while sentencing Callahan and Gillum to three and four years, respectively. We find no merit in this contention.
For the reasons stated above, the judgment of the trial court in reference to Maddox is due to be, and it is hereby, affirmed.
We have examined the statement of additional facts set out in the supplemental brief filed on behalf of Callahan and Gillum and find no support for a different result from that which we have reached in the case of appellant Maddox. Accordingly, the judgments of the trial court in reference to appellants Callahan and Gillum are likewise due to be, and they are hereby, affirmed.
 AFFIRMED. All the Judges concur.